IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No. 5:24-cv-527

| | |
|---|---|
| NORTH CAROLINA FARM BUREAU FEDERATION, INC.; HIGHT FAMILY FARMS, LLC; and TRIPLE B FARMS, INC., <br><br> *Plaintiffs,* <br><br> vs. <br><br> UNITED STATES DEPARTMENT OF LABOR; JOSÉ JAVIER RODRIGUEZ, in his official capacity as Assistant Secretary of the United States Department of Labor; and JESSICA LOOMAN, in her official capacity as Administrator, Wage & Hour Division of the United States Department of Labor, <br><br> *Defendants.* | |

## **VERIFIED COMPLAINT**

Plaintiffs, the North Carolina Farm Bureau Federation, Inc., Hight Family Farms, LLC., and Triple B Farms, Inc., hereby allege as follows:

## **THE PARTIES**

1. Plaintiff North Carolina Farm Bureau Federation, Inc. ("Farm Bureau") is a 501(c)(5) organization that advocates for the interests of North Carolina farmers before Congress, the North Carolina General Assembly, and state and federal regulatory agencies, including the Defendant.

2. Farm Bureau brings this suit on behalf of its volunteer farmer members who produce myriad of crops throughout North Carolina, such as tobacco, sweet potatoes, melons,

cotton, soybeans, corn, and wheat. Farm Bureau's members are the backbone of North Carolina's $111.1 billion agricultural sector.

3.  Farm Bureau has approximately 31,000 farmer members, including Plaintiffs Hight Family Farms, LLC, and Triple B Farms, Inc., who reside and farm in all 100 of North Carolina's counties.

4.  Farm Bureau's farmer members employ thousands of agricultural employees each year. Its members experience difficulty finding, hiring, and retaining qualified and dedicated employees to work on their farms. Therefore, many of Farm Bureau's farmer members rely on the H-2A program to source agricultural employees and they are intimately familiar with the program's extensive and often burdensome regulations.

5.  Farm Bureau's farmer members and other farmers participate in the H-2A program in various ways. Most procure H-2A workers through the North Carolina Growers Association ("NCGA"), a non-profit agricultural labor provider. In the early 2000s, NCGA entered into a collective bargaining agreement with an agriculture employee union as part of a settlement agreement that resolved protracted litigation. Any farmer that sources its H-2A employees from NCGA must adhere to terms of the collective bargaining agreement. To avoid being bound by the collective bargaining agreement, some of Farm Bureau's farmer members, such as Hight Family Farms and Triple B Farms, work with other H-2A providers.

6.  On behalf of its farmer members, Farm Bureau advocates for congressional reforms to the H-2A program. Hight Family Farms and Triple B Farms have also engaged in advocacy regarding H-2A reform legislation. Farm Bureau also frequently engages in the rulemaking process to modify the regulations that govern the program, including the Final Rule.

7.     Farm Bureau also advocates for its farmer members in favor of state statutes and regulations governing the relationship between farmers and agricultural employers. When some of these statutes were challenged in federal court, Farm Bureau engaged in litigation in support of the statutes, which were ultimately upheld by the Fourth Circuit, U.S. Court of Appeals. *Farm Labor Organizing Committee v. Stein*, 56 F.4th 339 (4th Cir. 2022).

8.     Farm Bureau's staff advocate for its farmer members based upon polices that the farmer members develop and adopt each year through a grassroots democratic process. Farm Bureau's farmer members grow a wide range of crops and raise many types of livestock and their farming operations vary in size and scale, and they are concerned about many policy issues including the environment, marketing their products, trade, crop insurance, tax policy, property rights, water use, and agriculture labor and employment. As such, Farm Bureau's policy positions reflect the concerns and priorities of its farmer membership, which represents the vast majority of farmers in the State.

9.     Farm Bureau's volunteer farmer members hold strong views relating to private property ownership and their exclusive rights to determine who is authorized to access their property.

10.     Farm Bureau's farmer members have consistently opposed the unionization of agricultural employees.

11.     Farm Bureau's farmer members believe that unions make resolving disputes with their employees more difficult, costly, and time consuming. Further, unions often engage in coercive tactics that put pressure on a farmer's supply chain or attempt to negotiate the terms of production contracts to favor farmers who employ workers who are members of a union.

12.     Farm Bureau's farmer members also have concerns about unions in agriculture because unions increase the cost of doing business in a global market. Farmers are price-takers, meaning that they are unable to set their own price for the commodities they grow or the livestock that they raise. Therefore, farmers operate on tight margins. Any additional expense to their operation can have significant consequences, including hurting their ability to compete in the marketplace.

13.     Farm Bureau's farmer membership includes at least one member that will file H-2A applications to bring foreign agricultural employees to their farms for the end of the 2024 growing season and many growing seasons into the future.

14.     Plaintiff Hight Family Farms, LLC is a diversified farm that grows tobacco, peppers, soybeans, corn, and wheat and raises beef cattle on 236 acres in Warren County, North Carolina. Its principal place of business is Macon, North Carolina. Hight Family Farms is a Farm Bureau member.

15.     Hight Family Farms hires on average 26 foreign agricultural guest workers annually through the H-2A program. The employees assist the farm in raising its tobacco and pepper crops. The farm plans to file an application after August 29, 2024, to bring in H-2A employees for the 2025 growing season.

16.     Plaintiff Triple B Farms, Inc. is a diversified farm with a principal place of business in Four Oaks, North Carolina. The farm produces tobacco, corn, wheat, and soybeans and raises beef cattle on approximately 700 acres in Johnston County, North Carolina. Triple B Farms is a member of Farm Bureau.

17.     Triple B Farms annually hires on average six foreign agricultural guest employees using the H-2A program. The employees primarily work with the farm's tobacco crop. Triple B

Farms intends to file an application after August 29, 2024, to bring in H-2A employees during the 2025 growing season.

18.     Defendant United States Department of Labor ("USDOL") is an executive agency of the federal government. USDOL is responsible for administering and enforcing various federal statutes, including but not limited to the Fair Labor Standards Act, the Family Medical Leave Act, and the Occupational Health and Safety Act. The USDOL is not responsible for processing immigration or naturalization applications or establishing policies regarding immigration services.

19.     However, the USDOL has limited statutory ministerial authority to administer the H-2A program through the activities of Defendants, the Employment and Training Administration ("ETA") and the Wage and Hour Division ("WHD"), which jointly issued the Final Rule.

20.     Among other duties, the ETA issues agricultural labor certifications under the H-2A program. Defendant Jose Javier Rodriguez is the Assistant Secretary of Labor who is leads the ETA. In his official capacity, Defendant Rodriquez manages and directs the ETA's activities, including issuing temporary labor certifications for the H-2A program.

21.     Among other duties, the WHD enforces the terms and conditions of employment that agricultural employers must follow under the H-2A program. Defendant Jessica Looman is the WHD's Administrator. In her official capacity, she manages and directs the WHD's enforcement of the H-2A program.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction under 5 U.S.C. §§ 702-03 and 28 U.S.C. § 1331.

23.     The federal government has waived sovereign immunity in suits brought pursuant to the Administrative Procedure Act ("APA"). 5 U.S.C. § 702.

24.     Defendants' promulgation of the Final Rule is a final agency action. 5 U.S.C. §§ 551(13), 704.

25.     Under the APA, this Court may hold unlawful and set aside the Final Rule, postpone its effective date pending judicial review, and award declaratory and injunctive relief. 5 U.S.C. §§ 705-706; 29 U.S.C. §§ 1361, 2201-02.

26.     Venue in this Court is proper because the Plaintiffs reside in the Eastern District of North Carolina and no property is involved in this action. 28 U.S.C. § 1391(e)(1)(C).  Moreover, more than 10,500 of Farm Bureau's farmer members operate within the Eastern District of North Carolina. Of that number, slightly more than 4,000 farm in the District's Western Division.

## BACKGROUND

### A.     Under the National Labor Relations Act, State laws govern the rights of agricultural employees to engage in collecting bargaining and concerted activities.

27.     Congress enacted the National Labor Relations Act ("NLRA") in 1935 to strike a balance between the interests of employers and employees with respect to the ability of employees to engage in collective bargaining and concerted activities. 29 U.S.C. § 157.

28.     In relevant part, the NLRA provides employees with "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." 29 U.S.C. § 157.

29.     The NLRA prohibits employers from discriminating against their employees "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ." 29 U.S.C. § 158(a)(3).

6

30.     The NLRA also bars employers from discharging or otherwise discriminating against an employee because the employee files charges or gives testimony in a proceeding under the NLRA. 29 U.S.C. § 158(a)(4).

31.     The NLRA established the National Labor Relations Board and provided it with exclusive enforcement authority to prevent unfair labor practices. 29 U.S.C. §§ 153, 156, 160.

32.     When Congress enacted the NLRA in 1935, it expressly stated that "any individual employed as an agricultural laborer" is not an employee under the NLRA and thus not entitled to its provisions relating to collective bargaining and concerted activities. 29 U.S.C. § 152(3).

33.     By exempting agricultural employees from the NLRA, Congress left to the States the discretion to regulate the relationship between employers and employees with respect to collective bargaining and concerned action within the agricultural industry.

34.     For more than a century, Congress and State Legislatures have wrestled with how to balance the political tension between employers and unions. Federal and State courts have frequently considered cases that have shaped the relationship between the two often opposing sides. Unions have boycotted and picketed employers who resist unionizing their work forces while some employers have held union elections for their workers. This public debate is a matter of political significance throughout the United States and in the agricultural community.

35.     Congress has amended the NLRA's definition of employee several times since 1935, but it has never adopted an amendment to bring agricultural employees under the NLRA's scope.

**B.      The Immigration Reform and Control Act of 1986 gave USDOL limited regulatory authority to help administer the H-2A program.**

36.     Congress enacted the Immigration Reform and Control Act of 1986, among other things, to establish a visa program to help farmers acquire sufficient employees to operate their

farms. The visa is commonly known as the H-2A program based on its statutory citation, 8 U.S.C. § 1101(a)(15)(H)(ii)(a).

37.     The Secretary of State, the Attorney General, the United States Department of Homeland Security, and USDOL each have responsibilities for administering the H-2A program. 8 U.S.C. §§ 1103-04; 1188.

38.     Under IRCA, the USDOL's regulatory authority is limited to certifying for the Attorney General's approval employer petitions to bring foreign agricultural employees into the United States. The USDOL must issue its certification when it determines that: "(A) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and (B) the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1188.

39.     Congress requires agricultural employers who are seeking to participate in the H-2A program to "offer to provide benefits, wages and working conditions required pursuant to this section and regulations." 8 U.S.C. § 1188(c)(3)(B)(i).

40.     The H-2A statute also requires that agricultural employers "furnish housing in accordance with regulations" to their employees. 8 U.S.C. § 1188(c)(4).

41.     By regulation, the USDOL also requires agricultural employers, among other things, to pay their H-2A employees an Adverse Effect Wage Rate ("AEWR"), to reimburse them for transportation from their home county to the agricultural employer's farm, and to provide meals or adequate kitchen facilities that will enable the employees to prepare their own food. *See generally* 20 C.F.R. §§ 655.120 (offered wage rate), 655.122 (contents of job offers).

42. The AEWR is also one of the measures used to determine the minimum wage for H-2A workers. *See* 89 Fed. Reg. at 34,060. But, the Final Rule eliminates a delay between the publication of the annual AEWR and the effective date of the AEWR. 89 Fed. Reg. 34,060.

43. Previously, changes to the AEWR did not take effect until January 1 of the following year. Under the Final Rule, however, the new AEWR will take effect immediately and cause Farm Bureau's farmer members who employ workers between December 14 and December 31 a significant direct financial hardship. The DOL anticipates that over a ten-year period this provision in the Final Rule will cost farms across the country an estimated $12-20 Million. 89 Fed. Reg. 34,049.

44. Moreover, H-2A employers who violate the H-2A program's regulations are subject to significant civil penalties and the possibility of debarment from the program. *See* 29 C.F.R. §§ 501.16 (sanctions and remedies – general), 501.19 (civil money penalty assessment), 501.20 (debarment and revocation).

45. The H-2A program plays a significant role in United States agriculture. It provides farmers across the nation with a reliable work force, especially in the fruit and vegetable sectors. The agricultural employees who work in the United States pursuant to H-2A visas are essential to providing nearly 8 billion people worldwide with safe, healthy, and affordable food and fiber.

46. Since Congress created it in 1986, more and more farmers have elected to participate in the H-2A program, even though the program is cumbersome to navigate and expensive to use.

47. According to the United States Department of Agriculture, H-2A certifications increased by more than 200 percent from 2010-2019. The number of farms applying for H-2A employees has increased by 95 percent over the same period.

48.     In North Carolina, farmers hired approximately 24,500 H-2A employees in 2022. Two years later, in 2024, almost 2,000 North Carolina farms employed 35,223 H-2A visa holders.

49.     This recent increase in the H-2A program use is consistent with a widespread decline in the number of domestic agricultural employees in the national labor force.

50.     In almost forty years since Congress created the H-2A program, USDOL has never attempted to expand the reach of its regulatory authority to provide H-2A employees with rights to engage collective bargaining or concerted action.

51.     In order to comply with this new regulatory scheme, Plaintiffs and their Members will face costs in time to the farmers to familiarize themselves with the new rule, or to hire outside compliance assistance.

**C.     The Final Rule provides agricultural employees with NLRA-style rights.**

52.     On April 29, 2024, USDOL published the Final Rule in the Federal Register. *Improving Protections for Workers in Temporary Agricultural Employment in the United States*, 89 Fed. Reg. 33,898 ("Final Rule").

53.     The Final Rule took effect on June 28, 2024, and applies to all H-2A applications filed by agricultural employers after August 28, 2024.

54.     The Final Rule requires that, as part of their H-2A application and related job offers, H-2A employers make assurances that they will not engage in "unfair treatment" of their agricultural employees, which include H-2A employees and domestic employees engaged in corresponding employment. 89 Fed. Reg. 34,062.

55.     Among these assurances, H-2A employers must agree they "will not intimidate, threaten, restrain, coerce, blacklist, discharge or in any manner discriminate against" or cause any

person to do the same, any other person who has exercised any rights under the Final Rule to ensure compliance with its prohibition on "unfair treatment." 89 Fed. Reg. 34,062.

56.     The Final Rule also mandates that H-2A employers "will not intimate, threaten, restrain, coerce, blacklist, discharge or in any manner discriminate against" any person "engaged in agriculture as defined and applied" in the Fair Labor Standards Act, because the person "has engaged in activities related to self-organization, including any effort to form, join, or assist a labor organization; or has engaged in other concerted activities for the purpose of mutual aid or protection relating to wages or working conditions . . . ." 89 Fed. Reg. 34,062, 34,068.

57.     The Final Rule's anti-discrimination provisions also apply when H-2A employees "refuse to attend an employer-sponsored meeting with the employer or its agent, representative or designee, if the primary purpose of the meeting is to communicate the employer's opinion concerning any activity protected" by the Final Rule; "or has refused to listen to employer-sponsored speech or view employer-sponsored communications, the primary purpose of which is to communicate the employer's opinion concerning any activity protected by" the Final Rule. 89 Fed. Reg. 34,063.

58.     The Final Rule mandates that H-2A employers permit an H-2A employee or an agricultural employee engaged in corresponding employment "to designate a representative to attend any investigatory interview that the worker reasonably believes might result in disciplinary action and must permit the worker to receive advice and active assistance from the designated representative during any such investigatory interview." 89 Fed. Reg. 34,063.

59.     The Final Rule requires H-2A employers to provide agricultural employees "residing in employer-furnished housing" to "invite, or accept at their discretion, guests to their living quarters and/or the common areas or outdoor spaces near such housing during the time that

is outside of the workers' workday subject only to reasonable restrictions designed to protect worker safety or prevent interference with other workers' enjoyment of these areas." 89 Fed. Reg. 34,603.

60.     The Final Rule also protects boycotts and picketing. 89 Fed. Reg. 34.007.

61.     When viewed as a whole, these mandates provide H-2A employees and agricultural employees engaged in corresponding employment almost identical protections to those afforded to employees under the NLRA.

**D.     The Final Rule will harm Plaintiff's farmer members who rely on the H-2A program.**

62.     Hight Family Farms, Triple B Farms and many of Farm Bureau's other farmer members are dependent on H-2A employees to work on their farms because there are not enough American agricultural employees to take those jobs.

63.     Hight Family Farms, Triple B Farms, and Farm Bureau's farmer members who use the H-2A program will have to become familiar with the Final Rule and implement its provisions. To comply with the Final Rule, they will have to invest time and resources to study the Final Rule and will likely have to hire attorneys, farm labor contractors, or farm labor service providers.

64.     Hight Family Farms, Triple B Farms, and many of plaintiff's farmer members who use the H-2A program object to the NLRA-style rights that the Final Rule forces upon them. They do not want to hire agricultural employees who are covered by these provisions. Some of them elect not to use the North Carolina Growers Association to source their labor because the Association has a collective bargaining agreement with a union.

65.     Hight Family Farms, Triple B Farms, and Farm Bureau's farmer members who use the H-2A program will endure administrative challenges and delays in managing their H-2A employees as they attempt to comply with the Final Rule's requirement that they allow their H-2A

employees to have a designated representative present either in person or virtually for any investigative interview their employee believe may result in disciplinary action. Delays to allow for an employee's designated representative to physically arrive at a farm field will waste precious time, compromise the quality of crops, and undermine employee morale.

66.     The Final Rule mandates that Hight Family Farms, Triple B Farms, and Farm Bureau's farmer members who use the H-2A program to provide their employees with NLRA-style rights that will negatively impact their ability to efficiently manage their farms. Thus, Hight Family Farms, Triple B Farms, and Farm Bureau's farmer members who use the H-2A program must choose between either participating in an H-2A program that will harm their farming operations or taking the risk of hiring non-H-2A employees, if they can find them at all.

## CLAIMS

## <u>COUNT I</u>

**The Final Rule is not in accordance with law because it conflicts with the National Labor Relations Act. (5 U.S.C. § 706)**

67.     Plaintiffs incorporate by reference all preceding paragraphs.

68.     Under the APA, courts shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A).

69.     The Final Rule, as promulgated, is not in accordance with the law.

70.     Congress enacted the NLRA to strike a balance between the interests of employers and unions.

71.     Under the NLRA, employees enjoy numerous rights to engage in collective bargaining and concerted activity, including protections against employer discrimination.

72.     Congress expressly stated in the NLRA that agricultural employees do not have a right to collective bargaining and concerted activity.

73.     When it exempted agricultural employees from the NLRA's scope, Congress left the policy decision regarding the rights of agricultural employees to engage collective bargaining and concerted activities to State Legislatures.

74.     For almost 90 years, Congress has not altered this statutory arrangement.

75.     The Final Rule unlawfully provides H-2A employees and agricultural employees engaged in corresponding employment with NLRA-style rights, including the authority to participate in concerted activity.

76.     Defendants promulgated the Final Rule to nullify the NLRA's agricultural employee exemption.

77.     The Final Rule contradicts the NLRA and is not in accordance with law. Therefore, it must be held unlawful, set aside, enjoined, or vacated.

## **COUNT II**

**The Final Rule exceeds Defendant's statutory authority under the Immigration Reform and Control Act of 1986. (5 U.S.C. § 706)**

78.     Plaintiffs incorporate by reference all preceding paragraphs.

79.     Under the APA, courts shall "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

80.     In establishing the H-2A program, Congress directed Defendant USDOL to certify H-2A applications for the Attorney General's approval when it determines that "(A) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and (B) the employment of

the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1188(a)(1).

81.    Under the H-2A program, farmers must "offer to provide benefits, wages and working conditions required pursuant to this section and regulations" to their agricultural employees. 8 U.S.C. § 1188(a)(3)(B)(i).

82.    When it established the H-2A program, Congress did not authorize Defendants to extend NLRA-style rights to H-2A employees and other agricultural employees engaged in corresponding employment.

83.    Since the H-2A program was established, Defendants have limited the scope its H-2A regulations to address wages, housing, transportation, and other similar matters. But Defendants now assert newfound authority to grant to agricultural employers collective bargaining and concerted activity rights.

84.    The Final Rule unlawfully exceeds the authority Congress granted to Defendants under IRCA and must be held unlawful, set aside, enjoined, or vacated.

## COUNT III

**The Final Rule exceeds Defendants' statutory jurisdiction and violates the Major Questions Doctrine. (5 U.S.C. 706; U.S. Const. art. I, § 1)**

85.    Plaintiffs incorporate by reference all preceding paragraphs.

86.    Under the APA, courts shall "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

87.    Under the major questions doctrine, a federal regulatory agency must identify "clear congressional authorization" to support its actions "in extraordinary cases when the history

Case 5:24-cv-00527-FL   Document 1   Filed 09/13/24   Page 15 of 23

and breadth and economic and political significance of the action at issue gives [courts] a reason to hesitate before concluding that Congress meant to confer such authority to" the agency. *N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*, 76 F.4th 291, 296 (4th Cir. 2023) (internal quotations omitted) (citing *West Virginia v. EPA*, 597 U.S. 697, 700 (2022)).

88. The major questions doctrine also applies in cases when "a different, 'distinct regulatory scheme'" conflicts "with the agency's newly asserted authority," "the asserted power raises federalism concerns," or the agency finds its new authority in an "ancillary provision." *N.C. Coastal Fisheries*, 76 F.4th at 297 (citations omitted).

89. Courts "are more hesitant to recognize new-found powers in old statutes against a backdrop of an agency failing to invoke them previously." *N.C. Coastal Fisheries*, 76 F.4th at 297 (citations omitted).

90. The Final Rule's attempt to extend collective bargaining and concerted activity rights to agricultural employees invokes a major question. Thus, Defendants must have a clear congressional authorization to justify promulgating the Final Rule.

91. For more than 100 years, employers and unions have engaged significant political debate. In response to the tension, which often resulted in violence, Congress enacted the NLRA to balance the interests between the two groups.

92. The NLRA is a distinct regulatory scheme that governs the relationship between employers, employees, and unions. Congress established National Labor Relations Board and tasked it with administering the NLRA, but it did not grant Defendants similar authority.

93. The NLRA exempts agricultural employees from NLRA and reserves to the States the authority to address the tension between employers and unions according to each State's policy preferences. Congress has not amended its decision to exempt agricultural employees from the

NLRA. Therefore, there is already an existing statutory means of dealing with the issue of unions in agriculture that conflicts with Defendants' "newly asserted authority." *N.C. Coastal Fisheries*, 76 F.4th at 297 (quoting *Brown & Williamson*, 529 U.S. at 143-46).

94. The Final Rule also contradicts the principles of federalism. Congress' decision not to provide agricultural employees with federal collective bargaining and concerted activity rights meant that States could adopt their own laws governing the relationship between agricultural employers, their employees, and unions. Some States, most notably California, have adopted state laws that provide collective bargaining and concerted activity rights to agricultural employees. Meanwhile other States, including North Carolina, have enacted strong right to work laws that allow employers and employees to choose whether they want to engage with unions. By extending mandatory collective bargaining and concerted activity rights to H-2A employees and agricultural employees engaged in corresponding employment, the Final Rule contradicts the right to work laws of various States, including North Carolina.

95. Defendants justify the Final Rule based upon ancillary provisions in IRCA that provide Defendants limited regulatory authority to certify H-2A applications and require H-2A employers to offer to provide benefits, wages and working conditions to their employees.

96. The NLRA's agricultural employee exception has stood untouched for almost 90 years. Congress enacted IRCA almost forty years ago and elected not to give H-2A employees the right to collectively bargain or engage in concerted activity. In light of the "balance under the existing regulatory regime, it is unsurprising that [Defendants have] never sought" the authority to provide agricultural employees with NLRA-style rights. *N.C. Coastal Fisheries*, 76 F.4th at 299. And yet, now Defendants assert that federal immigration law gives them authority to evade the NLRA's agricultural employee exemption.

17

97. Defendants cannot identify a clear congressional authorization to justify the Final Rule. Thus, the Final Rule should be held unlawful, set aside, enjoined, or vacated pursuant to the major questions doctrine.

## COUNT IV

**The Final Rule is an arbitrary and capricious agency action. (5 U.S.C. § 706)**

98. Plaintiffs incorporate by reference all preceding paragraphs.

99. Under the APA, courts shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

100. An agency rule is arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider" or its decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

101. The Final Rule provides agricultural employees with NLRA-style rights in contradiction to the NLRA and the laws of various States.

102. In establishing the H-2A program through IRCA, Congress granted Defendants with limited regulatory authority to certify H-2A applications and require farmers to offer to provide benefits, wages and working conditions to their H-2A employees. It certainly did not authorize Defendants to extend collective bargaining and concerted activity rights to agricultural employees.

103. Thus, Congress did not intend for Defendants to consider NLRA-style rights as a factor when it developed the Final Rule. Further, the Final Rule's legal justification is implausible because it directly conflicts with the NLRA and numerous State laws.

104.     Therefore, the Final Rule is arbitrary and capricious and must be held unlawful, set aside, enjoined, or vacated.

## PRAYER FOR RELIEF

For the reasons stated above, Plaintiff asks this Court to:

a.      Hold unlawful, vacate, enjoin, or set aside the Final Rule as contrary to law, unreasonable, and arbitrary and capricious.

b.      Issue orders preliminarily and permanently enjoining Defendants from implementing or enforcing the Final Rule.

c.      Award Plaintiffs their costs and reasonable attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, or other applicable law; and

d.      Award such other and further relief as this Court deems equitable and just.

Respectfully submitted this the 13th day of September 2024.

**NELSON MULLINS RILEY**
**& SCARBOROUGH LLP**

By: */s/ Phillip J. Strach*
Phillip J. Strach
N.C. State Bar No. 29456
Alyssa M. Riggins
N.C. State Bar No. 52366
Raleigh, North Carolina 27603
Telephone: (919) 329-3800
Facsimile: (919) 329-3799
Phil.strach@nelsonmullins.com
Alyssa.riggina@nelsonmullins.com

Phillip Jacob Parker, Jr.
Secretary & General Counsel
North Carolina Farm Bureau Federation, Inc.
PO Box 27766
Raleigh, NC 27611
(919) 987-1244

N.C. Bar No. 41504
jake.parker@ncfb.org

# VERIFICATION

I, Brandon Douglas Batten, declare as follows:

      1.      I am over the age of 18 and competent to make this verification.

      2.      I am the Farm Manager and Vice President of Triple B Farms, Inc., which is a Plaintiff in this case, and have personal knowledge of Triple B Farms, Inc.'s activities.

      3.      I have read the foregoing Verified Complaint and know the contents thereof.

      4.      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the factual statements in the Verified Complaint are true and correct to the best of my knowledge and belief.

      This the 13th day of September, 2024.

By: _____
Brandon Douglas Batten
Triple B Farms, Inc.

## VERIFICATION

I, Michael Paul Sherman, declare as follows:

      1.      I am over the age of 18 and competent to make this verification.

      2.      I am the Assistant to the President of the North Carolina Farm Bureau Federation, Inc. ("Farm Bureau"), which is a Plaintiff in this case. I have served as the Assistant to the President for three years.

      3.      I have read the foregoing Verified Complaint and know the contents thereof.

      4.      Through my role as Assistant to the President, I have personal knowledge of the Farm Bureau's activities, including those set forth in the Verified Complaint.

      5.      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the factual statements in the Verified Complaint are true and correct to the best of my knowledge and belief.

      This the 13th day of September, 2024.

By: _____
Michael Paul Sherman
Assistant to the President
North Carolina Farm Bureau
Federation, Inc.

**VERIFICATION**

I, David Michael Hight, Jr., declare as follows:

1. I am over the age of 18 and competent to make this verification.

2. I am a member of Hight Family Farms, LLC, which is a Plaintiff in this case, and have personal knowledge of Hight Family Farms, LLC's activities.

3. I have read the foregoing Verified Complaint and know the contents thereof.

4. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the factual statements in the Verified Complaint are true and correct to the best of my knowledge and belief.

This the 13th day of September, 2024.

By: _____
David Michael Hight, Jr.
Member, Hight Family Farms, LLC