IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No. 5:24-cv-00527-FL

| | |
|---|---|
| NORTH CAROLINA FARM BUREAU FEDERATION, INC., HIGHT FAMILY FARMS, LLC, and TRIPLE B FARMS, INC., | |
| *Plaintiffs,* | **PLAINTIFFS' MEMO ISO MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| UNITED STATES DEPARTMENT OF LABOR, JOSÉ JAVIER RODRIGUEZ in his official capacity as Assistant Secretary of the United States Department of Labor, and JESSICA LOOMAN in her official capacity as Administrator, Wage & Hour Division of the United States Department of Labor, | |
| *Defendants.* | |

## INTRODUCTION AND NATURE OF THE CASE

In this action, Plaintiffs North Carolina Farm Bureau Federation, Inc., ("Farm Bureau") Hight Family Farms, and Triple B Farms (collectively "Plaintiffs") seek to hold the United States Department of Labor ("USDOL") and other named Defendants accountable for promulgating an unlawful regulation relating to the H-2A agriculture guest worker program, *Improving Protections for Workers in Temporary Agricultural Employment in the United States*, 89 Fed. Reg. 33,898 ("Final Rule"). The Final Rule is deeply flawed and must be set aside under the Administrative Procedure Act ("the APA"). 5 U.S.C. § 706(2).

Specifically, in promulgating the Final Rule, the USDOL unconstitutionally usurped Congress' authority to make law. At base, the USDOL uses the Final Rule to grant foreign agricultural employees and the domestic employees who work alongside them with rights to

engage in self-organizing and concerted activities even though Congress declined to extend the same rights to agricultural employees almost 90 years ago when it enacted the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.* Nor does the USDOL have the authority to adopt the Final Rule pursuant to its limited power under ICRA. Finally, the Final Rule violates the major questions doctrine and is arbitrary and capricious under controlling precedent.

As the Southern District of Georgia recently concluded when it preliminarily enjoined the Final Rule in a similar case in select states, "The DOL may assist Congress, but may not become Congress." *Kansas, et al., v. U.S. Dep't of Labor*, 2:24-cv-76, 2024 WL 3938839, at *7 (S.D. Ga. Aug. 26, 2024). For the reasons set forth more fully below, the USDOL unconstitutionally attempted to become Congress. Accordingly, the Final Rule must be set aside.

## FACTUAL BACKGROUND[1]

On September 15, 2023, the USDOL published a Notice of Proposed Rulemaking ("NPRM") that proposed various revisions to the H-2A visa program that would "focus on strengthening protections for temporary agricultural workers and enhancing the Department's capabilities to monitor program compliance and take necessary enforcement actions against program violations." (SMF ¶18). The NPRM raised significant concerns for Individual Plaintiffs' and Farm Bureau's farmer members. (SMF ¶18). This is because the H-2A program plays a significant role in United States agriculture by providing farmers with a reliable work force. (SMF ¶13). The agricultural employees who work in the United States pursuant to H-2A visas are essential to ensuring global access to safe, healthy, and affordable food. (SMF ¶13).

---

[1] "SMF" as used herein refers to Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment filed simultaneously with this memorandum. A summary of those facts is contained herein.

4891-0951-5502 v.1

Congress established the current version of the H-2A program in 1986. (SMF ¶14). Under the program, the United States issues guest worker visas to individuals who come into the United States to work seasonal jobs in agriculture. 8 U.S.C. § 1101(a)(15)(H)(ii)(a). *See also* SMF ¶14.. The Secretary of State, the Attorney General, the Department of Homeland Security ("the DHS"), and the USDOL jointly administer the H-2A program. 8 U.S.C. §§ 1103-04; 1188. (SMF ¶14). The USDOL's primary role in the H-2A program is to certify employer petitions to bring foreign agricultural employees into the United States that meet the statutory requirements of 8 U.S.C. § 1188(a)(1). (SMF ¶14).

To ensure the hiring of H-2A employees does not adversely affect the wages and working conditions of U.S. farmworkers, H-2A employers must "offer to provide benefits, wages and working conditions" to their employees. (SMF ¶15; 8 U.S.C. § 1188(c)(3)(B)(i)). This and other corresponding statutes, require that agricultural employers provide housing, as well as meals or adequate kitchen facilities to prepare their own meals, to all H-2A employees. (SMF ¶15; 8 U.S.C. § 1188(c)(4); 20 CFR § 655.122). By regulation, the USDOL also sets the Adverse Effect Wage Rate ("AEWR") that H-2A employers must pay their agricultural employees. (SMF ¶15; 20 C.F.R. § 655.120). Employers who violate the H-2A program's regulations are subject to significant civil penalties and the possibility of debarment from the program. (SMF ¶15).

The process to obtain H-2A visas for workers is already arduous and includes a lengthy application, where farmer employers must certify to 22 conditions of employment being offered, and that the employer has "knowledge of" and will comply with applicable H-2A regulations. (SMF ¶16). This application is then submitted to the appropriate State Workforce Agency ("SWA"). (SMF ¶16). Once the SWA signs off on the job order, H-2A employers may begin recruiting farmworkers and complete the temporary labor certification process. (SMF ¶16). From

4891-0951-5502 v.1

there, H-2A employers must then work with the DHS and the Secretary of State to secure official H-2A visas for their employees. (SMF ¶16). Despite the cumbersome nature of the application process, more farmers are participating in the H-2A program each year because finding domestic employees who want to work in agriculture is increasingly challenging. (SMF ¶17). In fact, H-2A certifications have increased by more than 200 percent from 2010-2019. (SMF ¶17). The number of farms applying for H-2A employees has increased by 95 percent over the same period. (SMF ¶17). In 2024, almost 1,200 North Carolina farms employed 35,223 H-2A visa holders. (SMF ¶17).

The September 15, 2023 NPRM proposed significant changes to the H-2A visa program, including barring H-2A employers from retaliating against agricultural employees who engage in "self-organization" activities. (SMF ¶18). The NPRM also purported to require H-2A employers to: (1) provide a complete list of their employees within one week of a labor organization's demand; (2) designate a representative to attend and actively participate in meetings that the worker reasonably believes may lead to discipline; (3) refrain from expressing their views on labor organizations or collective bargaining; and (4) attest that they will bargain in good faith with labor organizations regarding proposed labor neutrality agreements or provide an explanation why they will not do so. (SMF ¶18). The USDOL received thousands of comments relating to the NPRM, including opposing comments submitted by Plaintiffs. (SMF ¶18).

On April 29, 2024, the USDOL published the Final Rule in the Federal Register. While the USDOL made some adjustments to the NPRM, it retained the fundamental concepts contained in its original proposal. Namely, the Final Rule requires that, as part of their H-2A application and related job offers, H-2A must employers make assurances that they will not engage in "unfair treatment" of their agricultural employees, which includes H-2A employees and domestic employees engaged in corresponding employment. (SMF ¶20). H-2A employers must also now

4

agree that they "will not intimidate, threaten, restrain, coerce, blacklist, discharge or in any manner discriminate against" any other person who has exercised any rights under the Final Rule to ensure compliance with its prohibition on "unfair treatment"; or because the person "has engaged in activities related to self-organization, including any effort to form, join, or assist a labor organization; or has engaged in other concerted activities for the purpose of mutual aid or protection relating to wages or working conditions . . . ."(SMF ¶21). The Final Rule also mandates that H-2A employers permit an H-2A employee or an agricultural employee "to designate a representative to attend any investigatory interview that the worker reasonably believes might result in disciplinary action and must permit the worker to receive advice and active assistance from the designated representative during any such investigatory interview." (SMF ¶22). The Final Rule also protects boycotts and picketing. (SMF ¶22).

To justify its inclusion of these concepts in the Final Rule, the USDOL stated "that these provisions, which safeguard worker voice and empowerment, will prevent adverse effect on similarly employed workers in the United States by alleviating some of the barriers H-2A workers face when raising complaints about violations of their rights under the program and advocating regarding working conditions." (SMF ¶23). The USDOL also wrongly asserted that 8 U.S.C. § 1188(a) provides sufficient statutory authority for the Final Rule, because it "has long relied on [the statute] to establish [H-2A] program requirements that ensure that the employment of H-2A workers does not adversely affect the wages and working conditions of workers in the United States similarly employed and is an area where the Department has significant expertise." (SMF ¶23). The Final Rule officially took effect on June 28, 2024, 89 Fed. Reg. 33,898, but due to the Final Rule's transition provisions, it only applied to H-2A employers submitting H-2A job applications on or after August 28, 2024. (SMF ¶23).

On June 10, 2024, seventeen states, a Georgia farm, and the Georgia Fruit and Vegetable Growers Association, challenged the Final Rule in the U.S. District Court for the Southern District of Georgia. *Kansas et al.,* 2024 WL 3938839 at *4. In their complaint, the plaintiffs alleged that the Final Rule "illegally provides collective bargaining rights to agricultural migrant workers employed in the United States under the H-2A visa program." *Id.* at *1. Plaintiffs sought a preliminary injunction to delay implementation of the Final Rule nationwide. *Id. See also* SMF ¶28.

The Southern District of Georgia preliminarily enjoined the Final Rule on August 26, 2024. The Court concluded that the plaintiffs had demonstrated they were likely to succeed on the merits of their claims. Notably, the Court found that "the Final Rule conflicts with the NLRA, and the Final Rule is unconstitutional." *Kansas et al.,* 2024 WL 3938839, at *7. Further, the Court found "no evidence of federal Congressional intent to create a right to collective bargaining for agricultural workers" and holding that [t]he Final Rule does just that." *Id.*, at *9. The Court limited the scope of its preliminary injunction to the seventeen Plaintiff states in the litigation. (SMF ¶29).

In response to the District Court's order, on August 28, 2028, the USDOL posted a notice on its website, stating that it "will delay updating its FLAG system to implement revised H-2A job order and application forms associated with the Farmworker Protection Rule, originally scheduled to begin at 7:00 p.m. Eastern Daylight Time on August 28, 2024, until further notice." (SMF ¶30). However, on September 10, 2024, the USDOL announced that it would begin requiring compliance with the Final Rule for all H-2A job orders submitted after September 12, 2024, in the areas of the country not impacted by the ruling in *Kansas, et al.* (SMF ¶30). Because the District Court's preliminary injunction order in *Kansas, et al* did not extend to North Carolina, H-2A employers in the State are currently subject to the Final Rule. (SMF ¶30).

On September 13, 2024, Plaintiffs filed the instant action seeking to hold unlawful, set aside, enjoin, or vacate the Final Rule. Prompt action is necessary to alleviate the impending harm that complying with the Final Rule would inflict upon Plaintiffs. (*See. e.g.* SMF ¶¶31-32).

## ARGUMENT

"Congress in 1946 enacted the APA 'as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices.'" *Loper Bright Enters. v. Raimondo*, 144 S.Ct. 2244, 2261 (2024) (internal citation omitted). The Final Rule violates the APA because it: (1) conflicts with the National Labor Relations Act; (2) exceeds USDOL's statutory authority under IRCA; (3) violates the major questions doctrine; and (4) constitutes an arbitrary and capricious action.

### I.      Standard of Review

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). When considering a motion for summary judgment, the Court views the facts in favor of the non-moving party. *Id.* Here, where there is a facial challenge to the Final Rule, no discovery is needed. Applying the law to the facts in this case, reveals that Plaintiffs are entitled to summary judgment as a matter of law.

Under the APA, courts shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C); *West Virginia v. Thompson*, 475 F.3d 204, 209 (4th Cir. 2007). *See also, Ryan, LLC v. Fed. Trade Comm'n,* ___F.Supp.3d___, No. 3:24-CV-00986-E, 2024

WL 3879954, at *14 (N.D. Tex. Aug. 20, 2024) (setting aside the FTC's Non-Compete Rule and noting that "[t]he APA directs the reviewing court to "hold unlawful and set aside agency action" when the action meets one of the standards set forth in 5 U.S.C. § 706(2)(A)-(C).)

## II. The Final Rule Conflicts With the National Labor Relations Act.

Congress enacted the NLRA in 1935 to strike a balance between the interests of employers and employees regarding the ability of employees to self-organize and engage in collective bargaining and concerted activities. 29 U.S.C. § 151; *H.K. Porter Co. v. N.L.R.B.*, 397 U.S. 99, 103 (1970) ("The object of this Act was not to allow governmental regulation of the terms and conditions of employment, but rather to ensure that employers and their employees could work together to establish mutually satisfactory conditions."). In relevant part, the NLRA provides employees with "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." 29 U.S.C. § 157. The NLRA prohibits employers from discriminating against their employees "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ." 29 U.S.C. § 158(a)(3). The NLRA also bars employers from discharging or otherwise discriminating against an employee because the employee files charges or gives testimony in a proceeding under the NLRA. 29 U.S.C. § 158(a)(4). The NLRA established the National Labor Relations Board and provided it with exclusive enforcement authority to prevent unfair labor practices. 29 U.S.C. §§ 153, 156, 160; *see San Diego Bldg. Trades Council, Millmen's Union, Loc. 2020 v. Garmon*, 359 U.S. 236, 244 (1959).

However, agricultural employees are not entitled to rights under the NLRA. When Congress enacted the NLRA, it expressly stated that "any individual employed as an agricultural

4891-0951-5502 v.1

laborer" is not an employee under the NLRA and thus not entitled to its provisions relating to collective bargaining and concerted activities. 29 U.S.C. § 152(3); *Holly Farms Corp. v. N.L.R.B.*, 48 F.3d 1360, 1370 (4th Cir. 1995) ("The protections of the Act extend only to statutory employees."). Although Congress amended the NLRA's definition of employee since 1935, it has never adopted an amendment to bring agricultural employees under the NLRA's scope. *See* 61 Stat. 137, Pub. L. 93-360, § 1(a), (b), 61 Stat. 137 (June 23, 1947); 88 Stat. 395, Pub. L. 95-598, Title III, § 319 (July 26, 1974); *see also, e.g.*, Farm Worker's Bill of Rights, H.R. 881, 93rd Cong., Title I (1973) (referred to committee, but no other action taken).

By exempting agricultural employees from the NLRA, Congress left to the States the discretion to regulate the relationship between employers and employees with respect to collective bargaining and concerted action within the agricultural industry. *See Garmon*, 359 U.S. at 244. As a result, some states regulate the relationships between farmers, farmworkers, and unions. *See Sweeney v. Pence*, 767 F.3d 654, 671 (7th Cir. 2014). Consistent with this freedom, several states allow farmworkers to collectively bargain and engage in concerted activity by statute. *See e.g.,* Ariz. Rev. Stat. § 23-1381 to 1395; Cal. Lab. Code § 1140 *et. seq.*; Colo. Rev. Stat. § 8-3-104(1); Kan. Stat. § 44-818 to 830; La. Stat. § 23:881 to 889; Mass. Gen. Laws ch. 150A, § 5A; Neb. Rev. Stat. Ann. § 48-901 to 911; N.Y. Lab. Law § 670; Or. Rev. Stat. § 662.805 to 662.825; Wis. Stat. Ann. § 111.115(3). Other states have repealed statutes that provided those rights to farmworkers. *See* Idaho Code §§ 22-4101 to 22-4113, *repealed by* Idaho S.L. 2003, ch. 109; Me. Rev. Stat. § 1321-1334, repealed Laws 2011, c. 565 § 1. Meanwhile, the vast majority of States, including North Carolina, do not grant farmworkers the right to collectively bargain or engage in concerted activity.

4891-0951-5502 v.1

North Carolina is a right-to-work state, *see* N.C. Gen. Stat. § 95-79(a). Thus, employees in North Carolina have the freedom to take jobs without being required to become a union member. *See* N.C. Gen. Stat. § 95-78 (declaring public policy). With respect to agricultural employees, North Carolina bars parties from conditioning the terms or conditions of a contract or settlement agreement based on whether a farmer is a union employer and it prohibits farmers from checking off union dues from their employees' paychecks. N.C. Gen. Stat. § 95-79(b). Recently, the Fourth Circuit rejected a challenge to this statute, concluding N.C. Gen. Stat. § 95-79(b) did not violate the rights of a union under the First and Fourteenth Amendments. *Farm Labor Org. Comm. v. Stein*, 56 F.4th 339, 348, 351, 354 (4th Cir. 2022).

In direct contradiction to Congress' obvious direction, which exempted agricultural workers from the NLRA, the USDOL promulgated the Final Rule to provide H-2A employees and agricultural employees engaged in corresponding employment with NLRA-style rights. A simple comparison of the text of the NLRA to the Final Rule clearly demonstrates the USDOL's improper intent; however, several egregious points warrant further discussion.

First, under the NLRA, employees enjoy the "the right to self-organization" and "to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. To give effect to those rights, the NLRA prohibits employers from discriminating against their employees "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ." 29 U.S.C. § 158(a)(3). Likewise, the Final Rule, in relevant part, requires that "[w]ith respect to any person engaged in agriculture as defined" under the Fair Labor Standards Act, H-2A employers must agree they or any other person have "not and will not intimidate, threaten, restrain, coerce, blacklist, discharge, or in any manner discriminate against" anyone who "[h]as engaged in

activities related to *self-organization*, including any effort to form, join, or assist a labor organization; or has engaged in other *concerted activities for the purpose of mutual aid or protection relating to wages or working conditions*. 89 Fed. Reg. 34,062 (emphasis added).

Second, the NLRA also bars employers from discharging or otherwise discriminating against an employee because the employee files charges or gives testimony in a proceeding under the NLRA. 29 U.S.C. § 158(a)(4). In similar fashion, the Final Rule requires H-2A employers to agree not to discriminate against any person who has taken certain actions relating to proceedings to enforce the H-2A program regulations, including but not limited to filing a complaint, presenting testimony, or consulting with an attorney. 89 Fed. Reg. 34,602.

Additionally, the Final Rule adopts other NLRA concepts that protect concerted activities. Its designated representative provision, *see* 89 Fed. Reg. 34,063, is almost a carbon copy of the principal articulated in 29 U.S.C. § 157 as interpreted by the Supreme Court in *N.L.R.B. v. J. Weingarten, Inc.*, 420 U.S. 251, 260 (1975) ("The action of an employee in seeking to have the assistance of his union representative at a confrontation with his employer clearly falls within the literal wording of s 7 that '(e)mployees shall have the right . . . to engage in . . . concerted activities for the purpose of . . . mutual aid or protection.'"). The Final Rule's requirement that H-2A employees allow their employees to invite guests to their living quarters would also be considered a protected concerted activity right under the NLRA. *See N.L.R.B. v. Babcock & Wilcox Co.*, 351 U.S. 105, 113 (1956) (stating "if the location of a plant and the living quarters of the employees place the employees beyond the reach of reasonable union efforts to communicate with them, the employer must allow the union to approach his employees on his property"). The Final Rule also protects boycotts and picketing, 89 Fed. Reg. 34,007, which the NLRA also protects. *N.L.R.B. v. Drivers, Chauffeurs, Helpers, Loc. Union No. 639*, 362 U.S. 274, 290 (1960) (holding "the Taft-

4891-0951-5502 v.1

Hartley Act authorized the Board to regulate peaceful 'recognitional' picketing only when it is employed to accomplish objectives specified in" the NLRA).

The USDOL makes clear its intent to give H-2A employees rights they do not have under the NLRA. The commentary to the Final Rule expressly states that USDOL was borrowing heavily from the NLRA in drafting its provisions. *E.g.*, 89 Fed. Reg. 34,006. (SMF ¶26). The USDOL "emphasizes that the activity that is being protected in this final rule is not 'collective bargaining' or 'unionization,' but instead is 'concerted activity for mutual aid and protection' . . . ." 89 Fed. Reg. 34,005. (SMF ¶24). It contends that the Final Rule's prohibitions on "retaliation for self-advocacy and concerted activity . . . fall[s] within the Department's authority to ensure that foreign labor certification of H-2A workers does not adversely affect similarly employed workers in the United States." 89 Fed. Reg. 34,005. (SMF ¶24). Thus, the USDOL contends that 8 U.S.C. § 1188(a)(1) authorizes it to grant NLRA-style rights to foreign agricultural workers, rights that domestic agricultural employees do not enjoy. While the USDOL's Final Rule commentary discusses preemption issues at length, SMF ¶27, it presents no arguments to refute the NLRA conflict issues. Nor could it. As the Southern District of Georgia found, "the Final Rule conflicts with the NLRA, and the Final Rule is unconstitutional." *Kansas et al.,* 2024 WL 3938839, at *7. It is clear that the Final Rule contradicts the NLRA and is therefore not in accordance with law. As such, the Final Rule must be held unlawful, set aside,[2] enjoined, or vacated.

### III. The Final Rule Exceeds the USDOL's Limited Authority Under IRCA.

No matter how the USDOL frames it, the Final Rule attempts to amend the NLRA's agricultural employee exception by regulation. The USDOL's regulatory authority under the H-

---

[2] While the court in *Kansas* preliminarily enjoined the Final Rule, it is more appropriate for this Court on summary judgment to "set aside" the Final Rule. *See Supra* pp 7-8*; Ryan, LLC v. Fed. Trade Comm'n,* ___F.Supp.3d___,No. 3:24-CV-00986-E, 2024 WL 3879954, at *14 (N.D. Tex. Aug. 20, 2024).

12

2A program is limited to setting the "minimum terms and conditions employees must offer workers to determine the availability of American workers to fill employers' jobs." *Mendoza v. Perez*, 754 F.3d 1002, 1008 (D.C. Cir. 2014). Based on this authority, the USDOL grants to H-2A employees and the domestic workers who labor with them self-organizing and concerted activity rights, rights Congress declined to grant to all agricultural employees under the NLRA. However, the USDOL's authority under 8 U.S.C. § 1188(a)(1) does not sweep as broadly as the USDOL claims.

As the Supreme Court has made clear, the USDOL "may not create a right that Congress has not." *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001). In *Alexander*, the Supreme Court analyzed whether Section 602 of the Civil Rights Act of 1964 created a private right of action on behalf of individuals who allege a government agency has discriminated against them on the basis of race, color, or national origin. 532 U.S. at 278. The Court observed that in enacting Section 601 of the Act, Congress created a private right of action for individuals to "sue to enforce § 601 of Title VI and obtain both injunctive relief and damages," *Id. at* 279, and "that regulations applying § 601's ban on intentional discrimination are covered by the cause of action to enforce that section," *Id.* at 284. However, with respect to Section 602, the Court stated that the right to assert a private cause of action "must come, if at all, from the independent force" of that specific statute. *Id.* at 286. While the language of Section 602 authorizes federal agencies to carry out Section 601's intentional discrimination protections by "issuing rules, regulations, or orders of general applicability," the Court noted that "'rights-creating' language . . . is completely absent from § 602." *Id.* at 288. The Court observed that Section 602's scope was limited to "effectuating rights already created" under Section 601. Further, the Court stated that: "Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'" *Id.* at 289 (quoting *California v. Sierra Club,* 451 U.S.

4891-0951-5502 v.1

287, 294 (1981)). Then it noted that Section 602 "focuses neither on the individuals protected nor even on the funding recipient being regulated, but on the agencies that will do the regulating." *Id*. Accordingly, the Court concluded that the "authorizing portion of § 602 reveals no congressional intent to create a private right of action." *Id*. In response to the parties claims that the regulations relating to Section 602 "contain rights-creating language," the Court held "it is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress." *Id.* at 275.

The Final Rule suffers from similar defects. It purports to bestow NLRA-style rights on H-2A employees and their domestic colleagues who work alongside them, but IRCA's text does not indicate that this was what Congress intended when it created the H-2A program. First, courts "generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts." *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 176 (1988). Congress enacted the NLRA and its agricultural employee exemption in 1935. It adopted IRCA and the H-2A Program 51 years later in 1986. If Congress wanted to provide farm workers with NLRA-style rights under the H-2A program, it could have done so then. But Congress elected not to amend the NLRA when it enacted IRCA. *See Agri Processor Co., Inc. v. N.L.R.B.*, 514 F.3d 1, 4 (D.C. Cir. 2008) (stating "there is no clear indication that Congress intended IRCA implicitly to amend the NLRA, but all available evidence actually points in the opposite direction"). Accordingly, when interpreting USDOL's authority to adopt NLRA-style rights under 8 U.S.C. §1188(a)(1), this court should "respect not only what Congress wrote but, as importantly, what it didn't write." *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 765 (2019) (plurality); *U.S. Telecom Ass'n v. F.C.C.*, 359 F.3d 554, 566 (D.C. Cir. 2004) ("It is clear here that Congress has not delegated to the FCC the authority to subdelegate to outside parties. The statutory 'silence' simply leaves that lack of

4891-0951-5502 v.1

authority untouched."); *Loper Bright Enterprises, Inc. v. Raimondo*, 45 F.4th 359, 374 (D.C. Cir. 2022) (Walker, J., dissenting) ("In fact, all else equal, silence indicates a lack of authority."), *majority opinion vacated and remanded Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024).

Second, as in *Alexander*, IRCA's grant of limited authority to the USDOL to certify H-2A petitions focuses on "the agenc[y] that will do the regulating"—*i.e.*, the USDOL and its certification process—rather than on "the individuals protected" by the NLRA-style rights the USDOL conjured up—*i.e.*, agricultural empmloyees. *Alexander*, 532 U.S. at 289. To the extent USDOL's authority to certify H-2A petitions focuses on individuals, it does so with respect to the H-2A employers who submit the petitions, not the H-2A workers who eventually come to work in the United States. *Id.* at 289 ("Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'") (quoting *California v. Sierra Club,* 451 U.S. 287, 294, (1981)). In contrast, the NLRA is focused on the rights of employees—i.e. individuals—to engage in collective bargaining and concerted activities. See e.g., *H. K. Porter Co.* 397 U.S. at 103 (stating the "Act . . . provided that employees had a federally protected right to join labor organizations and bargain collectively through their chosen representatives on issues affecting their employment"). Thus, IRCA's text reveals "no congressional intent to" authorize the USDOL to adopt the Final Rule's self-organizing and concerted activity provisions. *Alexander,* at 289.

As the Fourth Circuit has stated, "the rulemaking power granted to an administrative agency charged with the administration of a federal statute is not the power to make law. Rather, it is the power to adopt regulations to carry into effect the will of Congress as expressed by the statute." *Miller v. AT&T Corp.*, 250 F.3d 820, 833 (4th Cir. 2001) (quoting *Ernst & Ernst v.*

15

*Hochfelder*, 425 U.S. 185, 213-14 (1976)). Here, the USDOL relies on its limited authority to certify H-2A petitions to unlawfully make new law. If Congress wishes to grant self-organizing and concerted activity rights to H-2A employees, it is constitutionally allowed to do so. As an executive branch agency, the USDOL is not. Accordingly, the Final Rule unlawfully exceeds the authority Congress granted to the USDOL under IRCA and must be held unlawful, set aside, enjoined, or vacated.

IV.     **The Major Questions Doctrine Further Reveals the Final Rule's Defects.**

Under the major questions doctrine, a federal regulatory agency must identify "clear congressional authorization" to support its actions "in extraordinary cases when the history and breadth and economic and political significance of the action at issue gives [courts] a reason to hesitate before concluding that Congress meant to confer such authority to" the agency. *N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*, 76 F.4th 291, 296 (4th Cir. 2023) (internal quotations omitted) (citing *West Virginia v. EPA*, 597 U.S. 697, 700 (2022)). The Final Rule's attempt to extend collective bargaining and concerted activity rights to agriculture employees through the H-2A Program invokes a major question. Thus, Defendants must have a clear congressional authorization to justify promulgating the Final Rule.

The USDOL previously attempted to assert that the Final Rule does not implicate the major questions doctrine. In the Final Rule commentary, the USDOL contended that the Final Rule does not weld "extravagant statutory power over the national economy," 89 Fed. Reg. 33,995 (quoting *West Virginia,* 597 U.S. at 724). (SMF ¶23). It also claimed that the Final Rule only applies to H-2A employers who opt into the program and that the number of farmers who use the H-2A program is "a small fraction of the agricultural workforce." 89 Fed. Reg. 33,995. (SMF ¶24). The USDOL

also claimed to rely on its significant experience in the area of regulating the H-2A program. 89 Fed. Reg. 33,995. (SMF ¶24).

However, the USDOL is mistaken: this is a major questions case because it involves a matter of significant economic and political significance. (SMF ¶11). Agriculture contributed roughly $1.53 trillion to the United States' gross domestic product in 2023. (SMF ¶11). Approximately $203.5 billion of that amount was generated on America's farms. (SMF ¶11). Closer to home, agriculture is one of North Carolina's leading economic sector, generating $111.1 billion in annual state gross product and accounting for approximately 778,000 jobs or 16% of the State's workforce. (SMF ¶11). Put simply, H-2A employees contribute significantly to the United States' and North Carolina's agricultural economy.

Granting self-organizing rights to agricultural employees through the Final Rule also constitutes a monumental change to United States labor law. For more than 100 years, employers, employees, and unions have engaged in significant political debate. In response to this tension, which often resulted in violence, Congress enacted the NLRA to balance the interests between employees and employers. *H. K. Porter Co.,* 397 U.S. at 103. Congress established National Labor Relations Board and tasked it with administering the NLRA, but it did not grant the USDOL similar authority. Any revisions to this distinct regulatory scheme should be enacted by Congress, not the USDOL. *Kansas et al.,* 2024 WL 3938839, at *7. Accordingly, this is a major questions case.

The USDOL's attempt to avoid scrutiny under the major questions doctrine also overlooks the Fourth Circuit's recent decision in *N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC,* 76 F.4th 291 (4th Cir. 2023). There the Fourth Circuit applied the doctrine to affirm this Court's dismissal of an environmental organization's citizen suit that alleged commercial shrimpers in

North Carolina were violating the Clean Water Act. *Id.* at 294. The Court properly observed that the major questions doctrine applies when a case concerns "significant and economic consequences," which are present here. *Id.* at 296. However, the Court further clarified that the Supreme Court "has highlighted several other hallmarks that should send us searching for clear authorization from Congress before adopting an expansive construction of the statute, that would generate an extraordinary grant of regulatory authority." *Id.* at 297 (cleaned up). These hallmarks, or indicators, "are non-exhaustive and need not be present in every major-questions case." *Id.*

First, courts should apply the doctrine "when the Act's structure indicates that Congress did not mean to regulate the issue in the way claimed." *Id.* (citations omitted). As noted above, IRCA's grant of limited certification authority to the USDOL does not empower the agency to extend NLRA-style rights to agricultural employees. *See Supra* at Section III.

Second, the Fourth Circuit observed that it "might draw the same inference when there is a different, 'distinct regulatory scheme' already in place to deal with the issue which would conflict with the agency's newly asserted authority." *N.C. Coastal Fisheries,* 76 F.4th at 297 (citations omitted). Again, Congress exempted agricultural employees from the scope of the NLRA—a distinct regulatory scheme—that comprehensively and exclusively regulates employer and employee relations with respect to collective bargaining and concerted activities. For almost 90 years, Congress has left the NLRA's agricultural employee exemption alone. And it elected not to grant temporary agricultural guest workers NLRA-style rights when it created the H-2A program almost forty years ago. In light of the "balance under the existing regulatory regime, it is unsurprising that [USDOL] never sought" the authority to provide agricultural employees with NLRA-style rights. *N.C. Coastal Fisheries*, 76 F.4th at 299. The Final Rule blatantly conflicts with

the NLRA because many of its self-organizing provisions mirror those contained in the NLRA. *Kansas et al.,* 2024 WL 3938839, at *7.

Third, the major questions doctrine also counsels courts to be "hesitant to recognize new-found powers in old statutes against a backdrop of an agency failing to invoke them previously." *N.C. Coastal Fisheries,* at 297 (citations omitted); *see also Bradford v. U.S. Dep't of Labor*, 101 F.4th 707, 727 (10th Cir. 2024) (stating "the Supreme Court has typically applied the Major Questions Doctrine where an 'agency claim[ed] to discover' regulatory authority for the first time 'in a long-extant statute'"). Here, Congress enacted IRCA and established the H-2A program almost forty years ago. Since then the USDOL has promulgated numerous revisions to the H-2A regulations, but never has it asserted the authority to circumvent the NLRA's agricultural employee exemption and grant H-2A employees with self-organizing and concerted activity rights.

Fourth, the doctrine applies when an agency asserts power that "raises federalism concerns." *N.C. Coastal Fisheries* 76 F.4th at 297 (citing *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 172–73, 174, (2001); *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021)). The Final Rule certainly contradicts the principles of federalism. Congress' decision not to provide agricultural employees with federal collective bargaining and concerted activity rights meant that States could adopt their own laws governing the relationship between agricultural employers, their employees, and unions. Some states, most notably California, have adopted state laws that provide collective bargaining and concerted activity rights to agricultural employees. Meanwhile, other States, including North Carolina, have enacted strong right-to-work laws that allow employers and employees to choose whether they want to engage with unions. The Final Rule disregards the interests of States to set policies regarding the relationship between agricultural employers and their employees. The

4891-0951-5502 v.1

USDOL justifies the Final Rule using an unprecedented interpretation of federal immigration law that substantially undermines the authority of states to determine their own policy positions relating to agricultural labor. By extending mandatory self-organizing and concerted activity rights to H-2A employees and agricultural employees engaged in corresponding employment, the Final Rule contradicts the right-to-work laws of various States, including North Carolina. The Final Rule also encroaches on the rights of States to regulate the relationship between agricultural employees and farmers, which is impermissible. *See Sierra Club v. U.S. Army Corps of Engineers*, 909 F.3d 635, 648 (4th Cir. 2018) ("If adopted, the Corps' broad interpretation of its own discretionary authority would significantly upset Congress's carefully prescribed allocation of authority between federal and state agencies in the Clean Water Act.").

The major questions doctrine applies to the Final Rule. The USDOL does not, and indeed cannot, point to a clear congressional authorization to justify its attempt to give agricultural employees in the H-2A program NLRA-style rights. The USDOL's claim that the Final Rule is authorized pursuant to its statutory power to certify that the hiring of H-2A employees does not adversely affect the wages and working conditions of similarly situated domestic farmworkers has no merit. Indeed, "more is required before" this Court may hold that USDOL "has been granted the asserted power" to justify the Final Rule. *N.C. Coastal Fisheries* 76 F.4th at 302 (4th Cir. 2023). Thus, the Final Rule should be held unlawful, set aside, enjoined, or vacated pursuant to the major questions doctrine.

## V. The Final Rule is an Arbitrary and Capricious Agency Action.

Finally, the Final Rule is arbitrary and capricious. While courts must narrowly consider whether an agency action is arbitrary and capricious and may not substitute its judgment for the agency's, the Court's analysis must look at whether:

the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

As argued above, the Final Rule provides agricultural employees with NLRA-style rights in contradiction to the NLRA and the laws of various States. In establishing the H-2A program, Congress granted USDOL with limited regulatory authority to certify H-2A applications and require farmers to offer to provide benefits, wages and working conditions to their H-2A employees. It plainly did not authorize USDOL to extend NLRA-style rights to agricultural employees, when the NLRA expressly denies those rights to that same class of individuals. Thus, Congress did not intend for USDOL to consider granting H-2A workers NLRA-style rights as a factor when it developed the Final Rule. Additionally, the Final Rule's legal justification is implausible because it directly conflicts with the NLRA and numerous State laws.

Most notably, however, is the USDOL's failure to assert a plausible explanation for the Final Rule's obvious conflict with the NLRA. In the Final Rule's commentary, the USDOL observes that several organizations submitted comments asserting that the NPRM conflicted with the NLRA. (SMF ¶26). In response, the USDOL asserts "Congress did not intend for the NLRA to wholly occupy the field with respect to labor regulation and thereby foreclose all other regulation of that area." 89 Fed. Reg. 33,994. (quoting *Nat'l Ass'n of Manufacturers v. Perez*, 103 F. Supp. 3d 7, 25 (D.D.C. 2015)). (SMF ¶26). Thus, the USDOL concludes it is free to grant H-2A workers with NLRA-style rights as it pleases. The USDOL then states that it did not use the full extent of its alleged power in the Final Rule because it did not give H-2A workers the right to collectively bargain. 89 Fed. Reg. 33,994. (SMF ¶26). The USDOL follows up this self-serving

4891-0951-5502 v.1

argument by rehashing its oft-stated refrain: its power to dictate working conditions on farms authorizes it to give NLRA rights to H-2A workers. 89 Fed. Reg. 33,994.

The USDOL's argument misses the point. Congress expressly exempted agricultural employees from the NLRA and its hallmark protections, the right to collectively bargain and engage in concerted activity. In so doing, Congress left to the States the question of whether and how to regulate the relationship between farmers and farmworkers. States have taken different approaches to this public policy issue, but a large majority of them do not provide farmworkers with NLRA-style rights. *E.g., compare* Cal. Lab. Code § 1140 *et. seq. with* N.C. Gen. Stat. § 95-79. However, the Final Rule intrudes on the authority of those States to balance the relationship between farmers and their employees with respect to collective bargaining and concerted activities.

But the Final Rule's confusing commentary states that USDOL does not intend for the Final Rule "to preempt any applicable State laws or regulations that *expressly protect* agricultural workers or regulate labor-management relations, organizing, or collective bargaining in the agricultural sector." 89 Fed. Reg. 34,007 (emphasis added). The commentary responds to comments from labor unions and worker advocacy organizations that asked USDOL to clarify in the Final Rule that it would preempt N.C. Gen. Stat. § 95-79(b), which, as noted above, prohibits the use of sue-and-settle tactics to force farms to unionize and agreements that require farmers to deduct union dues from their employees' paychecks. 89 Fed. Reg. 34,009. (SMF ¶27). The USDOL declined the invitation, stating that "The law does not appear to govern whether a farmworker in North Carolina may engage in protected concerted activity as outlined [in the Final Rule], or whether a North Carolina employer could discipline a worker for such activity, and . . . would not 'effectively give states a veto power of the federal program' or 'override the specific H-2A work authorizations provided by federal law.'" 89 Fed. Reg. 34,008. (SMF ¶27). Noting several

States that have adopted statutes that "regulate organizing, collective bargaining, labor-management relations, overtime, heat stress, tools, and other issues affecting agricultural workers," the USDOL states "It has carefully crafted its new protections for concerted activity to avoid creating conflicts with existing State laws and regulations that provide for a system of collective bargaining for farmworkers and/or explicitly prohibit retaliation against farmworkers for exerting other rights guaranteed by State laws or regulations." 89 Fed. Reg. 34,008. (SMF ¶27). Tellingly, the USDOL's response reveals its latent intent for the Final Rule to override State laws that regulate the rights of agricultural employees in ways that contradict the policy goals that undergird the Final Rule.

In North Carolina, farmworkers do not enjoy the right to collectively bargain and engage in concerted activity. Instead, the State's right-to-work statute allows farmers and their employees to enter into collective bargaining agreements, if they agree to do so. The statute also does not bar agricultural employees from engaging in these activities, but it does not penalize farmers if they choose not to accommodate or facilitate their employees' interest in self-organizing. But the Final Rule flips North Carolina's law upside down. Under the Final Rule, North Carolina's H-2A employers are now required to allow their H-2A employees and the domestic employees who work with them to engage in self-organizing and concerted action in direct conflict to North Carolina's law. In other words, the Final Rule imposes by regulation a NLRA-style law on North Carolina's farmers in the absence of clear congressional authorization. The USDOL states that in adopting the Final Rule it does not want to upset State laws with which it agrees. But it says nothing in its commentary about how the Final Rule will trump State laws that take the opposite approach. Thus, it has, "entirely failed to consider an important aspect of the problem" before it and "offered an explanation for its decision that . . . is so implausible that it could not be ascribed to a difference

23

in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43. Therefore, the Final Rule is arbitrary and capricious and must be held unlawful, set aside, enjoined, or vacated.

## <u>CONCLUSION</u>

There is no genuine dispute of material facts in this case. Based on the foregoing, Plaintiffs respectfully request the Court enter summary judgment in their favor, holding the Final Rule unlawful and either setting aside, enjoining, or vacating the Final Rule.

Respectfully submitted this the 13th day of October 2024.

**NELSON MULLINS RILEY
& SCARBOROUGH LLP**

By: */s/ Phillip J. Strach*
Phillip J. Strach
N.C. State Bar No. 29456
Alyssa M. Riggins
N.C. State Bar No. 52366
Raleigh, North Carolina 27603
Telephone: (919) 329-3800
Facsimile: (919) 329-3799
Phil.strach@nelsonmullins.com
Alyssa.riggins@nelsonmullins.com

Phillip Jacob Parker, Jr.
Secretary & General Counsel
North Carolina Farm Bureau
Federation, Inc.
PO Box 27766
Raleigh, NC 27611
(919) 987-1244
N.C. Bar No. 41504
jake.parker@ncfb.org

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of October 2024, I electronically filed the foregoing

**Plaintiffs Brief in Support of Motion for Summary Judgment** with the Court using the

CM/ECF system, and will serve a copy of the same upon counsel for Defendants in accordance

via email and US Mail.

Michael P. Clendenen
Michael Gaffney
Anna Slusarski
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12028
Washington, DC 20005
Michael.P.Clendenen@usdoj.gov
Michael.J.Gaffney@usdoj.gov
Anna.Slusarski@usdoj.gov

Paige O'Hale
Deputy Chief, Civil Division
United States Attorney's Office
Eastern District of North Carolina
150 Fayetteville Street
Suite 2100
Raleigh, NC 27601
Paige.OHale@usdoj.gov

*Counsel for Defendants*

**NELSON MULLINS RILEY
& SCARBOROUGH LLP**

By: */s/ Phillip J. Strach*
Phillip J. Strach
N.C. State Bar No. 29456
Alyssa M. Riggins
N.C. State Bar No. 52366
Raleigh, North Carolina 27603
Telephone: (919) 329-3800

Facsimile: (919) 329-3799
Phil.strach@nelsonmullins.com
Alyssa.riggins@nelsonmullins.com

Phillip Jacob Parker, Jr.
Secretary & General Counsel
North Carolina Farm Bureau
Federation, Inc.
PO Box 27766
Raleigh, NC  27611
(919) 987-1244
N.C. Bar No. 41504
jake.parker@ncfb.org