**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

NORTH CAROLINA FARM BUREAU FEDERATION, INC., *et al.*,

Plaintiffs,

v.

U.S. DEPARTMENT OF LABOR, *et al.*,

Defendants.

Case No. 5:24-cv-00527-FL

**DEFENDANTS' COMBINED MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ........ 1

BACKGROUND ........ 3

I. DOL's Authority to Grant Temporary Labor Certifications Is Pivotal to Operation of the H-2A Program Overall. ........ 3

II. The Final Rule Empowers Workers to Ensure Compliance with the H-2A Program's Minimum Requirements to Prevent Adverse Effects to Workers in the United States. ........ 5

III. Procedural Background ........ 8

LEGAL STANDARD ........ 8

ARGUMENT ........ 9

I. Defendants Are Entitled to Summary Judgment on All Four Counts. ........ 9

A. The Challenged Provisions Are a Proper Exercise of DOL's § 1188 Authority. ........ 9

B. The Challenged Provisions Do Not Violate the NLRA. ........ 16

C. The Challenged Provisions Are Not Arbitrary and Capricious. ........ 22

II. Plaintiffs Have Not Established that They Are Entitled to a Permanent Injunction ........ 25

III. Vacatur Is Not Warranted, and Any Relief Should Be Limited to the Plaintiffs ........ 26

V. If the Court Grants Relief to Plaintiffs, the Court Should Sever Any Provisions Found to Be Unlawful from the Remainder of the Final Rule. ........ 29

CONCLUSION ........ 30

# TABLE OF AUTHORITIES

**Cases**

*Abbott Lab'ys v. Gardner*,
387 U.S. 136 (1967) .................... 27

*AFL-CIO v. Dole*,
923 F.2d 182 (D.C. Cir. 1991) .................... 13, 15, 23

*Alabama Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021) .................... 15

*Alexander v. Sandoval*,
532 U.S. 275 (2001) .................... 21, 22

*Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Nat'l Lab. Rels. Bd.*,
466 F. Supp. 3d 68 (D.D.C.), *order amended on reconsideration*, 471 F. Supp. 3d 228 (D.D.C. 2020), *aff'd in part, rev'd in part and remanded*, 57 F.4th 1023 (D.C. Cir. 2023) .. 30

*Appalachian Voices v. U.S. Forest Serv.*,
2002 WL 34686279 (W.D. Va. Dec. 13, 2002) .................... 9

*Arizona v. Biden*,
40 F.4th 375 (6th Cir. 2022) .................... 28

*Bayou Lawn & Landscape Servs. v. Sec'y of Labor*,
713 F.3d 1080 (11th Cir. 2013) .................... 10

*Benisek v. Lamone*,
585 U.S. 155 (2018) .................... 25

*Biden v. Nebraska*,
600 U.S. 482 (2023) .................... 15

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps. of Eng'rs*,
354 F. Supp. 3d 1253 (N.D. Ala. 2018) .................... 9

*Bloch v. Powell*,
227 F. Supp. 2d 25 (D.D.C. 2002) .................... 9

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) .................... 27, 29

*CASA de Md., Inc. v. Trump*,
971 F.3d 220 (4th Cir. 2020) .................... 28

*Chamber of Commerce v. City of Seattle*,
890 F.3d 769 (9th Cir. 2018) .................... 20

*Chamber of Com. of U.S. v. Reich*

74 F.3d 1322 (D.C. Cir. 1996) .......... 18, 19, 21

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984) .......... 10

*Cornish v. Dudas*,
540 F. Supp. 2d 61 (D.D.C. 2008) .......... 26

*Dep't of Homeland Sec. v. New York*
140 S. Ct. 599 (2020) .......... 28

*Epic Tech, LLC v. Raleigh Startup Sols. LLC, No. 5:23-cv136D*,
2023 WL 4492495 (E.D.N.C. June 5, 2023) .......... 25

*Farm Labor Organizing Committee v. Stein*,
56 F.4th 339 (4th Cir. 2022) .......... 23, 24

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) .......... 22, 25

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985) .......... 9

*Garcia-Celestino v. Ruiz Harvesting, Inc.*,
843 F.3d 1276 (11th Cir. 2016) .......... 13

*Georgia v. President of the United States*,
46 F.4th 1283 (11th Cir. 2022) .......... 28

*Gill v. Whitford*,
585 U.S. 48 (2018) .......... 28, 29

*Golden State Transit Corp. v. City of Los Angeles*,
493 U.S. 103 (1989) .......... 20, 21

*Holly Farms Corp. v. NLRB*,
517 U.S. 392 (1996) .......... 17

*Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) .......... 25

*Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Emp't Relations Comm'n*,
427 U.S. 132 (1976) .......... 19

*K Mart Corp. v. Cartier, Inc.*,
486 U.S. 281 (1988) .......... 30

*Kansas v. DOL*,
No. 2:24cv00076, 2024 WL 3938839 (S.D. Ga. Aug. 26, 2024) .......... *passim*

*Little Sisters of Poor Saints Peter & Paul Home v. Pennsylvania*,

591 U.S. 657 (2020) .................... 22

*Loper Bright Enter. v. Raimondo*,
144 S. Ct. 2244 (2024) .................... 10, 12

*Louisiana v. Becerra*,
20 F.4th 260 (5th Cir. 2021) .................... 28

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994) .................... 28, 29

*MD/DC/DE Broadcasters Ass'n v. FCC*,
236 F.3d 13 (D.C. Cir. 2001) .................... 30

*Mendoza v. Perez*,
754 F.3d 1002 (D.C. Cir. 2014) .................... 10

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .................... 22

*N. Carolina Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*,
76 F.4th 291 (4th Cir. 2023) .................... 15

*N.C. Fisheries Ass'n, Inc. v. Gutierrez*,
518 F. Supp. 2d 62 (D.D.C. 2007) .................... 9

*Nat'l Ass'n of Mfrs. v. Perez*,
103 F. Supp. 3d 7 (D.D.C. 2015) .................... 20

*NFIB v. OSHA*,
595 U.S. 109 (2022) .................... 14

*Nken v. Holder*,
556 U.S. 418 (2009) .................... 26

*Overdevest Nurseries v. Walsh*,
2 F.4th 977 (D.C. Cir. 2021) .................... 13

*San Diego Building Trades Council v. Garmon*,
359 U.S. 236 (1959) .................... 19

*Transmission Access Policy Study Grp. v. Fed. Energy Regul. Comm'n*,
225 F.3d 667 (D.C. Cir. 2000) .................... 9

*Trump v. Hawaii*,
585 U.S. 667 (2018) .................... 27, 28

*UAW-Lab. Emp. & Training Corp. v. Chao*,
325 F.3d 360–63 (D.C. Cir. 2003) .................... 19, 20, 21

*UFW v. Ariz. Agric. Emp't Rels. Bd.*,

669 F.2d 1249 (9th Cir. 1982) .......... 20

*Vita-Mix Corp. v. Tristar Prod., Inc.*,
No. 1:07cv275, 2008 WL 11383504 (N.D. Ohio Sept. 30, 2008) .......... 25

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982) .......... 27

*West Virginia v. EPA*,
597 U.S. 697 (2022) .......... 14, 15, 16

*Williams v. Usery*,
531 F.2d 305 (5th Cir. 1976) .......... 7

*Willmar Poultry Co. v. Jones*,
430 F. Supp. 573–78 (D. Minn. 1977) .......... 20

**Statutes**

5 U.S.C. § 706 .......... 27

8 U.S.C. § 1101 .......... 3

8 U.S.C. § 1184 .......... 3, 4

8 U.S.C. § 1188 .......... *passim*

29 U.S.C. § 152 .......... 2, 17, 18

29 U.S.C. § 157 .......... 17

29 U.S.C. § 158 (3) .......... 18

29 U.S.C. § 159 .......... 18

29 U.S.C. § 164 .......... 23

29 U.S.C. § 203 .......... 7, 17

29 U.S.C. § 213 .......... 19

Cal. Lab. Code § 1140 et seq. .......... 20

Fair Labor Standards Act of 1938,
52 Stat. 1060 (1938) .......... 19

N.C. Gen. Stat. § 95-79 .......... 19, 23

**Rules**

Fed. R. Civ. P. 56 .......... 9

**Regulations**

20 C.F.R. part 655, subpart B .......... 3

20 C.F.R. § 655.101 .......... 11

20 C.F.R. § 655.103 .......... 3, 5, 16
20 C.F.R. § 655.120 .......... 29
20 C.F.R. § 655.121 .......... 3
20 C.F.R. § 655.122 .......... 12, 29
20 C.F.R. § 655.130 .......... 3
20 C.F.R. § 655.135 .......... *passim*
20 C.F.R. § 655.137 .......... 29
20 C.F.R. § 655.182 .......... 29
29 C.F.R. § 501.4 .......... *passim*
29 C.F.R. § 655.135 .......... 7
29 C.F.R. § 780.3 .......... 19
43 Fed. Reg. 10,306, 10,312 .......... 11
52 Fed. Reg. 20,496 (June 1, 1987) .......... *passim*
52 Fed. Reg. 20,524 (June 1, 1987) .......... 5, 16
73 Fed. Reg. 77,110 (Dec. 18, 2008) .......... 16
75 Fed. Reg. 6884 (Feb. 12, 2010) .......... 16
89 Fed. Reg. 33,898 (Apr. 29, 2024) .......... *passim*

## INTRODUCTION

Nearly 40 years ago, Congress delegated authority to the Department of Labor ("DOL") to ensure that the hiring of temporary nonimmigrant farmworkers pursuant to the H-2A program did not "adversely affect the wages and working conditions of workers in the United States similarly employed." *See* 8 U.S.C. § 1188(a)(1). Beginning in 1987 and over the last four decades, DOL has promulgated regulations to implement that clear and broad statutory command. The Challenged Provisions[1] continue that effort by affording workers employed under the H-2A program—both H-2A workers and their domestic non-H-2A co-workers—with the tools necessary to advocate for themselves in response to H-2A employers who fail to provide the required baseline wages and working conditions. *See* Final Rule, *Improving Protections for Workers in Temporary Agricultural Employment in the United States*, 89 Fed. Reg. 33,898 (Apr. 29, 2024) ("Final Rule" or "Rule"). "Empowering workers in this way thus can improve compliance with the various terms and conditions of H-2A employment that [DOL] has separately determined are necessary to prevent adverse effect on similarly employed workers." *Id.* at 33,991. Further, in light of the H-2A workforce's unique vulnerabilities, the Challenged Provisions seek to place such workers "on more equal footing with similarly employed workers and thus reduce the potential for this workforce's vulnerability to undermine the advocacy efforts of similarly employed workers." *Id*. Notwithstanding the Rule's fealty to Congress's direction, Plaintiffs allege that the Challenged Provisions violate the National Labor Relations Act ("NLRA"), the Immigration and Nationality Act ("INA"), as amended by the Immigration Reform and Control Act of 1986 ("IRCA"), and the Administrative Procedure Act ("APA"). Plaintiffs now seek summary judgment.

Plaintiffs' motion should be denied for Defendants are entitled to summary judgment on all four counts. As to Counts Two and Three, as another Court has explained, "the 'best reading' of § 1188, in its entirety, is that Congress granted the DOL the authority to issue regulations to

[1] The term "Challenged Provisions" refers to 20 C.F.R. § 655.135(h)(2), (m), and (n) and 29 C.F.R. § 501.4(a)(2). In Section IV, Defendants explain why any relief should under no circumstances apply to the entire Final Rule.

ensure that any certifications it issues for H-2A visas do not 'adversely affect' American agricultural workers." *Kansas v. DOL*, No. 2:24-cv-00076, 2024 WL 3938839, at *5 (S.D. Ga. Aug. 26, 2024). That includes the authority to promulgate the Challenged Provisions: "DOL acted within its authority as proscribed by Congress through [IRCA]" when it issued the Challenged Provisions. *Id.* Count Four also fails because DOL reasonably explained the Challenged Provisions and relied on the factors that Congress expected it to consider. As the *Kansas* court explained, "[DOL] is obliged to balance the competing goals" of IRCA and "it provided sufficient reasoning for its decision." *Id.* at *7 (alterations in original) (citation omitted).

Defendants are similarly entitled to summary judgment on Count One. The Challenged Provisions do not extend the protections or enforcement mechanisms of the NLRA to workers in the H-2A program. The NLRA provides specific rights and establishes an entire infrastructure to interpret and enforce those rights, including through a collective bargaining process. The Challenged Provisions only prevent H-2A employers from retaliating against covered workers in the H-2A program for engaging in certain protected activities, such as speaking together with their employer about working conditions (*i.e.*, engaging in protected concerted activity). Only DOL would investigate such retaliation, as it already does for existing forms of protected activity.

In any event, Plaintiffs point to no provision of the NLRA that prohibits DOL from promulgating the Challenged Provisions. Instead, Plaintiffs assert that these provisions violate the NLRA because that law's definition of "employee" does "not include any individual employed as an agricultural laborer." *See* 29 U.S.C. § 152(3). But that definitional provision does not preclude wholesale any regulation of agricultural employees' interactions with their employers. It is well established that individuals that fall outside of the NLRA's "employee" definition may be covered by other labor statutes and regulations—including those promulgated by other federal agencies.

Plaintiffs' claim that the Final Rule is arbitrary and capricious in violation of the APA is also without merit. Plaintiffs' arguments largely duplicate their claim that the Challenged Provisions conflict with the NLRA, and thus fail for the same reasons. DOL provided a reasonable

explanation, and in particular explained that the Challenged Provisions do not preempt North Carolina state law. Defendants are thus entitled to summary judgment on Count Four.

Finally, Plaintiffs have not even addressed—let alone established—irreparable harm and are thus not entitled to a permanent injunction. Moreover, the public interest, including the need to prevent adverse effects to workers in the United States, weighs against an injunction. To the extent the Court finds that Plaintiffs have established all four factors required for injunctive relief, any relief should be limited to those parties and only as to those of the Challenged Provisions as to which all four factors are met. The APA does not require a universal remedy or vacatur, and the Challenged Provisions are severable from the remainder of the Rule.

The Court should deny Plaintiffs' motion and grant Defendants' cross-motion.

## BACKGROUND

### I. DOL's Authority to Grant Temporary Labor Certifications Is Pivotal to Operation of the H-2A Program Overall.

The INA as amended by IRCA, establishes an "H-2A" nonimmigrant visa classification for a worker "having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform" temporary or seasonal "agricultural labor or services." 8 U.S.C. § 1101(a)(15)(H)(ii)(a); *see also* 8 U.S.C. §§ 1184(c)(1), 1188. The statute requires multiple federal agencies to take several steps before foreign workers may be admitted to the United States under the H-2A classification.

A prospective H-2A employer must apply to DOL for a temporary employment certification ("TEC").[2] Congress authorized DOL to issue a TEC only if certain statutory requirements are met. First, DOL must certify that:

[2] To apply for a TEC, employers must first complete and submit a job order, 20 C.F.R. § 655.103(b), to DOL's National Processing Center ("NPC") between 60–75 days "before the employer's first date of need," *id.* § 655.121(b). After the NPC receives the job order, it transmits a copy to the State Workforce Agency ("SWA") in the relevant state. 20 C.F.R. § 655.121(e)(1). The SWA then must confirm that the job order complies with various requirements, including that the employer has agreed to "abide by the requirements of [20 C.F.R. part 655, subpart B]." 20

> (A) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and
>
> (B) the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed.

8 U.S.C. § 1188(a)(1). Unless both conditions (A) and (B) are established, DOL may not issue a TEC. *Id.* § 1188(b) ("The Secretary of Labor may not issue a certification under subsection (a) with respect to an employer if the conditions described in that subsection are not met . . . ."). Second, DOL may not issue a TEC "if any" of the additional conditions listed in 8 U.S.C. § 1188(b) exist. These conditions include if: (1) "[t]here is a strike or lockout in the course of a labor dispute which, under the regulations, precludes such certification;" (2) in the previous two years, the employer employed H-2A workers and "substantially violated a material term or condition" of a

C.F.R. § 655.121(e)(2); *see also id.* § 655.121(a)(4) (a "job order must satisfy the requirements for agricultural clearance orders set forth in 20 C.F.R. part 653, subpart F, and the requirements set forth in § 655.122"). One of the longstanding requirements of subpart B is that an employer make a number of "assurances," including that it will not engage in discriminatory hiring practices, is not seeking H-2A workers among an ongoing strike or lockout, and has not or will not treat unfairly any person who has engaged in a host of protected activities. *See* 20 C.F.R. § 655.135.

After reviewing the job order, the SWA works with the employer to address any noted deficiencies. *Id.* § 655.121(e)(2). When the SWA accepts the job order as fully compliant, the SWA will "place the job order in intrastate clearance and commence recruitment of U.S. workers." *Id.* § 655.121(f). If the "area of intended employment" spans multiple states, the SWA that initially reviewed and approved the job order informs the NPC that the job order covers multiple states, and then the NPC transmits the approved job order to the SWAs in the other states where recruitment must occur. *Id.* § 655.121(f). A SWA must keep an approved job order on active file until the recruitment period ends, generally after 50 percent of the work contract has elapsed. *Id.* §§ 655.121(g), 655.135(d). The SWA must refer to the employer each U.S. worker who applies to an active job order. *Id.* § 655.121(g). After a job order has been approved and posted by a SWA, the employer must apply for a TEC from DOL. *Id.* § 655.130. The application must be made no less than 45 days before the first date of need. *Id.* § 655.130(b); *see also* 8 U.S.C. § 1188(c)(1) (DOL may not require application be filed more than 45 days prior to need for H-2A workers).

Once an employer obtains a TEC from DOL, it may then file a petition for a nonimmigrant worker with the United States Citizenship and Immigration Services ("USCIS"), a component of the Department of Homeland Security ("DHS"). *See* 8 U.S.C. § 1184(c). If the petition is approved, the foreign workers whom the employer seeks to employ must generally apply for a nonimmigrant H-2A visa at a U.S. embassy or consulate abroad, and seek admission to the United States with U.S. Customs and Border Protection, another component of DHS.

TEC; (3) the employer does not provide adequate workers' compensation assurances; or (4) the employer fails to make "positive recruitment efforts within a multi-state region of traditional or expected labor supply." *Id.* § 1188(b). Third, certain rules "shall apply in the case of the filing and consideration of an application for a labor certification under [§ 1188(a)]." *Id.* § 1188(c). For example, DOL must ensure that the employer (i) "has complied with the criteria for certification (including criteria for the recruitment of eligible individuals as prescribed by the Secretary)" and (ii) does not have "qualified eligible individuals . . . to perform such labor or services on the terms and conditions of a job offer which meets the requirements of the Secretary." *Id.* § 1188(c)(3)(A).[3]

## II. The Final Rule Empowers Workers to Ensure Compliance with the H-2A Program's Minimum Requirements to Prevent Adverse Effects to Workers in the United States.

Since 1987, the H-2A statutory and regulatory scheme has provided numerous wage and working condition protections for H-2A visa workers and workers in corresponding employment,[4] including anti-retaliation provisions. *See, e.g., Labor Certification Process for the Temporary Employment of Aliens in Agriculture and Logging in the United States,* 52 Fed. Reg. 20,496, 20,517 (June 1, 1987) ("1987 H-2A IFR"). Before DOL promulgated the Final Rule, these anti-retaliation protections provided that H-2A employers cannot "intimidate, threaten, restrain, coerce, blacklist, discharge or in any manner discriminate against" an employee who has "filed a complaint," "instituted" a "proceeding," "testified" "in any proceeding," "consulted with an employee of a legal assistance program or an attorney," or "exercised or asserted on behalf of

---

[3] To ensure that the H-2A program did not, in its implementation, adversely affect workers in the United States, Congress also delegated broad authority to DOL to ensure that these baseline protections are actually provided by employers. *See* 8 U.S.C. § 1188(g)(2) (authorizing DOL to "impos[e] appropriate penalties and seek[] appropriate injunctive relief and specific performance of contractual obligations" as "necessary to assure employer compliance with terms and conditions of employment under this section"). As DOL explained in 1987, "[i]t is clear from the enactment of IRCA . . . that the Congress intended that DOL would increase its effort regarding the enforcement of labor standards with respect to the H-2A programs." *Enforcement of Contractual Obligations for Temporary Alien Agricultural Workers Admitted Under Section 216 of the Immigration and Nationality Act,* 52 Fed. Reg. 20,524, 20,524 (June 1, 1987) ("1987 WHD IFR").

[4] "Corresponding employment" refers to the employment of non-H-2A workers by an employer who has an approved *Application for Temporary Employment Certification* in any work included in the job order, or in any agricultural work performed by the H-2A workers. 20 C.F.R. § 655.103.

themselves or others any right or protection afforded by 8 U.S.C. § 1188" or DOL regulations. 20 C.F.R. § 655.135(h) (effective Nov. 14, 2022); 29 C.F.R. § 501.4(a) (effective Nov. 14, 2022).

Despite these protections, DOL found that "violations of the H-2A program requirements remain pervasive." 89 Fed. Reg. at 33,989. "[W]hen [Wage and Hour Division ("WHD")] investigates H-2A employers, it typically does not find full compliance with the law, with back wages averaging several hundred dollars owed per worker. But WHD cannot investigate every farm on which H-2A workers are employed." *Id.*; *see id.* 33,988 (explaining that, "in the previous 5 fiscal years, in 88 percent of WHD's H-2A investigations, WHD found employers in violation of the law," and citing a report finding that "70 percent of WHD investigations of farms found violations and that a farm employer's probability of being investigated in any year is 1.1 percent"). DOL further found that H-2A visa workers represent a population especially vulnerable to exploitation because of "the temporary nature of the work, frequent geographic isolation of the workers, and dependency on a single employer." *Id.* at 33,987. It also found that retaliation against H-2A workers for asserting or advocating for their rights remains common. *Id.* at 33,993. In some instances, DOL has "debarred and assessed penalties against H-2A employers that instructed workers to lie about their pay to investigators and threatened to kill, harm, punish, fire, blacklist, or deport workers for talking to authorities." *Id.* at 33,998. Based on this experience, DOL determined that the existing H-2A program regulations did not provide sufficient protections for H-2A workers to advocate for themselves regarding working conditions. *Id.* at 33,987.

The agency further found that similarly employed domestic workers "may be less likely to face unique vulnerabilities and forms of retaliation experienced by H-2A workers." *Id.* at 33,992. Because H-2A workers are easier to exploit, some employers are more likely to fill jobs through the H-2A program and less likely to hire U.S. workers. *See id.* at 33,991. "[U]se of the H-2A program has grown dramatically over the past decade while overall agricultural employment in the United States has remained stable, meaning that fewer workers in the United States are employed as farmworkers." *Id.* at 33,990. Thus, DOL determined that the "exploitation and abuse" of H-2A workers by "unscrupulous employers" risks "contribut[ing] to economic and workforce

instability" and potentially worse conditions for workers in the United States as a result. *Id.* at 34,405. Because DOL is required to certify that H-2A visas will not adversely affect workers in the United States, *see id.* at 33,993 (citing 8 U.S.C. § 1188(a)(1)), additional protections were necessary in order to "place the H-2A workforce on more equal footing with similarly employed workers [in the United States] and thus reduce the potential for this workforce's vulnerability to undermine the advocacy efforts of similarly employed workers." *Id.* at 33,991.

DOL issued the Final Rule to "establish the minimum terms and conditions of employment (*i.e.*, the 'baseline' or working conditions) necessary to 'neutralize any adverse effect resultant from the influx of temporary foreign workers.'" *See id.* at 33,987 (quoting *Williams v. Usery*, 531 F.2d 305, 306-07 (5th Cir. 1976)). The Challenged Provisions expand the list of activities protected from retaliation to safeguard the ability of workers covered by the H-2A program to express concerns, and together ask for changes in their working conditions (*i.e.*, concerted activities for mutual aid and protection), *id.* at 33,990, and impose "new employer obligations" that ensure H-2A employers do not retaliate against workers because those workers have advocated about their working conditions or have invited or accepted guests to worker housing. *Id.* at 33,991.

The Challenged Provisions include 20 C.F.R. § 655.135(h)(2),[5] which states: H-2A employers cannot "intimidate, threaten, restrain, coerce, blacklist, discharge or in any manner discriminate against" an employee who has, *inter alia*, "engaged in activities related to self-organization, including any effort to form, join, or assist a labor organization; or has engaged in other concerted activities for the purpose of mutual aid or protection relating to wages or working conditions; or has refused to engage in any or all of such activities," *id.* § 655.135(h)(2)(i),[6] or "refused to attend an employer-sponsored meeting with the employer or its agent, representative or designee, if the primary purpose of the meeting is to communicate the employer's opinion concerning any activity protected by this subpart; or has refused to listen to employer-sponsored

[5] Parallel provisions appear at 29 C.F.R. § 501.4(a)(2).

[6] 20 C.F.R. § 655.135(h)(2) & (m) apply only to persons engaged in agriculture as defined and applied in 29 U.S.C. § 203(f), *i.e.*, persons exempt from the NLRA. *See* 89 Fed. Reg. at 33,991.

speech or view employer-sponsored communications, the primary purpose of which is to communicate the employer's opinion concerning any activity protected by this subpart," *id.* § 655.135(h)(2)(ii).[7]

**III. Procedural Background**

Plaintiffs—two farms and one trade organization that purports to represent agricultural employers in North Carolina—filed this suit on September 13, 2024. ECF No. 1 ("Compl."). Plaintiffs allege that the Challenged Provisions are unlawful because they violate the NLRA, the IRCA, and the major questions doctrine, and are arbitrary and capricious. *See* Compl. ¶¶ 67–104. On October 14, 2024, Plaintiffs filed a motion for summary judgment. ECF No. 11; *see also* Pls.' Mem. ISO Mot. for Summ. J., ECF No. 13 (hereinafter "Pls.' Mot."). For the sole purpose of the parties' summary-judgment motions, the parties have stipulated that the administrative record comprises the Notice of Proposed Rulemaking, Comments, and the Final Rule, all of which are publicly available.

Three separate cases in other districts involve challenges to the same Final Rule. *See Kansas v. DOL*, No. 2:24-cv-76-LGW-BWC (S.D. Ga.); *Barton v. DOL*, No. 5:24-cv-24 (E.D. Ky.); *Int'l Fresh Produce Ass'n v. DOL*, No. 1:24-cv-309-HSO-BWR (S.D. Miss.). On August 26, 2024, the *Kansas* court preliminarily enjoined DOL from enforcing the Final Rule within the seventeen states (not including North Carolina) that were plaintiffs in that case and against the private plaintiffs in that case. *See Kansas*, No. 2:24-cv-00076, 2024 WL 3938839, at *13. Cross-motions for summary judgment in *Kansas*, as well as motions for preliminary injunctions in *Barton* and *International Fresh Produce Association*, are all now *sub judice*.

## **LEGAL STANDARD**

Generally, summary judgment is appropriate where "the movant shows that there is no

[7] Other changes were made to § 655.135(h)(1)(v) and (vii), but Plaintiffs do not challenge them. Additionally, § 655.135(m), requires, *inter alia*, that an employer "must permit a worker to designate a representative to attend any investigatory interview that the worker reasonably believes might result in disciplinary action," and § 655.135(n) permits workers to invite or accept guests to worker housing under certain circumstances.

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, where—as here—a district court reviews final agency action, "the rules governing summary judgment[] [motions in general] do not apply[,] because of the limited role of a court in reviewing the administrative record." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps. of Eng'rs*, 354 F. Supp. 3d 1253, 1266 (N.D. Ala. 2018) (citing *N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 79 (D.D.C. 2007)). In APA cases, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the standard of review." *Id.* at 1267 (citing *Bloch v. Powell*, 227 F. Supp. 2d 25, 31 (D.D.C. 2002)). Plaintiffs carry a "heavy burden" to show that the agency acted arbitrarily and capriciously. *Transmission Access Policy Study Grp. v. Fed. Energy Regul. Comm'n*, 225 F.3d 667, 714 (D.C. Cir. 2000); *accord Appalachian Voices v. U.S. Forest Serv.*, 2002 WL 34686279, at *2 (W.D. Va. Dec. 13, 2002). "The factfinding capacity of the district court is thus typically unnecessary." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). "[C]ourts are to decide, on the basis of the record the agency provides, whether the action passes muster under the appropriate APA standard of review." *Id.*

## ARGUMENT

### I. Defendants Are Entitled to Summary Judgment on All Four Counts.

#### A. The Challenged Provisions Are a Proper Exercise of DOL's § 1188 Authority.

As the *Kansas* court explained, "the 'best reading' of § 1188, in its entirety, is that Congress granted the DOL the authority to issue regulations to ensure that any certifications it issues for H-2A visas do not 'adversely affect' American agricultural workers." *Kansas*, 2024 WL 3938839, at *5. That includes the authority to promulgate the Challenged Provisions: "DOL acted within its authority as proscribed by Congress through [IRCA]" when it issued the Challenged Provisions. *Id.* at *7; *see also id.* ("Final Rule does not exceed [rulemaking] authority granted to the DOL by Congress under § 1188."). Thus, Defendants are entitled to summary judgment as to Counts Two and Three.

**1.** Congress delegated broad authority to DOL to promulgate regulations to ensure that an employer's use of H-2A workers would not harm similarly employed workers in the United States. "Section 1188(a)(1) establishes the INA's general mission," but "Congress left it to [DOL] to implement that mission through the creation of specific substantive provisions." *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014)).[8] Congress "often enact[s]" statutes in which "the agency is authorized to exercise a degree of discretion." *Loper Bright*, 144 S. Ct. at 2263. "[S]ome statutes 'expressly delegate[]' to an agency the authority to give meaning to a particular statutory term." *Id.* (citation omitted). "Others empower an agency to prescribe rules to 'fill up the details' of a statutory scheme, or to regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility.'" *Id.* (citation omitted).

Section 1188 is one such statute that "delegates discretionary authority to an agency." *See id.* "The statute explicitly envisions implementing regulations that will clarify the meaning and application of its provisions." *Mendoza*, 754 F.3d at 1021-22 (citing 8 U.S.C. § 1188(b)(1), subsections of (c)(3), and (c)(4)). The Eleventh Circuit similarly explained that IRCA "expressly *grants* DOL rulemaking authority over the agricultural worker *H-2A* program." *Bayou Lawn & Landscape Servs. v. Sec'y of Labor*, 713 F.3d 1080, 1084 (11th Cir. 2013) (emphasis in original).

The rulemaking "authority Congress conferred upon the DOL can be found in § 1188 of the IRCA." *Kansas*, 2024 WL 3938839, at *5. In § 1188(c), Congress set forth rules that "shall apply in the case of the filing and consideration of an application for a labor certification under this section"—*i.e.*, the labor certification described in § 1188(a). 8 U.S.C. § 1188(c); *see also Kansas*, 2024 WL 3938839, at *5 ("Section 1188(c) expounds upon the DOL's role in the certification process by providing 'rules [that] apply in the case of the filing and consideration of an application for a labor certification.'"). Subsection (c)(3)(A) then provides:

[8] Notably, *Mendoza* nowhere cites *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), *overruled by Loper Bright Enter. v. Raimondo*, 144 S. Ct. 2244 (2024), nor otherwise suggests § 1188 is ambiguous or that the court is deferring to the agency's interpretation of the statute. *See generally* 754 F.3d 1002; *see also id.* at 1007.

> The Secretary of Labor shall make, not later than 30 days before the date such labor or services are first required to be performed, the certification described in subsection (a)(1) if—
>
> > (i) the employer has complied with the *criteria for certification* (including criteria for the recruitment of eligible individuals *as prescribed by the Secretary*), and
> >
> > (ii) the employer does not actually have, or has not been provided with referrals of, qualified eligible individuals who have indicated their availability to perform such labor or services on *the terms and conditions of a job offer which meets the requirements of the Secretary*.

8 U.S.C. § 1188(c)(3)(A) (emphasis added). Other provisions in § 1188 reflect that these *criteria* and *requirements* will be laid out in *regulations*. For example, § 1188(c)(3)(B) describes the circumstances in which employers must "offer to provide benefits, wages and working conditions required pursuant to this section *and regulations*." *Id*. § 1188(c)(3)(B)(i) (emphasis added); *see also id.* § 1188(b)(2)(A) (referring to "material term[s] [and] condition[s] of the labor certification" described in § 1188(a)). The statute as a whole, and § 1188(c)(3) in particular, vests the Secretary with authority to issue regulations governing the terms and conditions of employment under the program, and thus with discretionary authority to "give meaning" to and "fill up the details" of § 1188(a)(1)(B)'s adverse-effect standard (which is cross-referenced in § 1188(c)(3)(A)). *See Kansas*, 2024 WL 3938839, at *5 ("Congress grants the DOL the power to issue regulations to ensure that the certification requirements of § 1188(a)—specifically, the requirement that American agricultural workers not be adversely affected—are met before the DOL issues such a certification.").[9]

**2.** Soon after IRCA's enactment in 1986, DOL began issuing regulations to effectuate its statutory responsibility under what is now § 1188(a).[10] *See* 1987 H-2A IFR, 52 Fed. Reg. at

[9] The Secretary's authority has been delegated to "the Office of Foreign Labor Certification (OFLC)," which is tasked with issuing TECs, as well as WHD, which is tasked with "conduct[ing] certain investigatory and enforcement functions with respect to terms and conditions of employment" under the H-2A program. *See* 20 C.F.R. § 655.101(a), (b).

[10] The 1987 regulations retained the minimum terms and conditions of employment set forth in the 1978 pre-IRCA regulations. *See* 1978 H-2A Rule, 43 Fed. Reg. 10,306, 10,312.

20,507 (describing "methodology for the twofold determination of availability of domestic workers and of any adverse effect"); *see also Loper Bright*, 144 S. Ct. at 2258 ("respect to [agency] interpretations of federal statutes" is "especially warranted when [such interpretations are] issued roughly contemporaneously with enactment of the statute and remain[] consistent over time").

For example, a TEC application must contain the terms and conditions of employment, 20 C.F.R. § 655.122(b), (c), and the employer must agree to abide by all H-2A regulations, *id.* § 655.135. In addition, DOL's offered wage provision requires employers to offer, advertise in their recruitment, and pay the highest of various wages, including the Adverse Effect Wage Rate ("AWER"), the prevailing wage, any collective bargaining wage, and the federal and state minimum wages. *See* 20 C.F.R. §§ 655.120(a), 655.122(*l*). These requirements prevent the use of H-2A workers from adversely affecting the wages and working conditions of workers in the United States. The applicable wage must be offered to U.S. workers, and then—to the extent an insufficient number of U.S. workers are willing to perform the requested labor—to both H-2A workers and workers in corresponding employment. *Id.* § 655.122(a), (*l*).

Other regulations setting forth minimum terms and conditions of employment similarly prevent adverse effects to workers in the United States. *See, e.g.*, 20 C.F.R. § 655.122(f) (employer provided items); *id.* § 655.122(g) (meals); *id.* §655.122(h) (inbound and outbound transportation); *id.* § 655.122(i) (guarantee to offer the worker employment for at least three-fourths of the work contract); *id.* § 655.122(j) (earnings records); *id.* § 655.122(k) (hours and earnings statements); *id.* § 655.122(m) (frequency of pay); *id.* § 655.122(n) (termination for cause); *id.* § 655.122(o) (protections in the event of contract impossibility); *id.* § 655.122(p) (deductions); *id.* § 655.122(q) (provision of work contract). The regulations require that these minimum wages and conditions be provided to both H-2A workers and workers in corresponding employment—including U.S. workers—in order to further DOL's statutory mandate to prevent adverse effects. *See* 20 C.F.R. § 655.103(b) (definition of "corresponding employment"), *id.* § 655.122(d)–(q) (requirements of work contract to be included in and provided to workers in corresponding employment).

So too does the regulatory requirement—issued in 1987 shortly after IRCA's enactment—that employers provide assurances that they will not retaliate against workers for taking various steps to ensure employer compliance with the requirements of IRCA and its implementing regulations. *See* 1987 H-2A IFR, 52 Fed. Reg. at 20,501, 20,517 (describing assurances).

In issuing these implementing regulations, DOL "has historically understood the INA's adverse effect requirement" as (1) "establishing a baseline 'acceptable' standard for working conditions below which workers in the United States would be adversely affected" and (2) "requiring parity between the terms and conditions of employment provided to H-2A workers and other workers employed by an H-2A employer." 89 Fed. Reg. at 33,987; *see Garcia-Celestino v. Ruiz Harvesting, Inc.*, 843 F.3d 1276, 1285 (11th Cir. 2016) ("The H-2A regulations . . . require an 'employer' to provide certain minimum benefits to H-2A temporary workers," thereby "ensur[ing] that foreign workers will not appear more attractive to the 'employer' than domestic workers . . . ."); *Overdevest Nurseries v. Walsh*, 2 F.4th 977, 984 (D.C. Cir. 2021) (citing *Mendoza* and finding corresponding employment regulations to be "eminently reasonable").

**3.** IRCA represents a "broad congressional delegation" to DOL in which "Congress entrusted" the agency with a significant role: "strik[ing] the balance" between the "competing goals" of "providing an adequate labor supply and protecting the jobs of domestic workers"—interests "which are often in tension." *AFL-CIO v. Dole*, 923 F.2d 182, 187 (D.C. Cir. 1991). DOL has made that determination since prior to IRCA's enactment in 1987, including by setting minimum standards and protections for H-2A workers and those in corresponding employment. *See* 1987 H-2A IFR, 52 Fed. Reg. at 20,496 ("IRCA codif[ies] DOL's role" in the "agricultural labor certification process" to prevent adverse effects). And in enacting IRCA, Congress vested DOL with "discretion" to determine "how to ensure that the importation of farmworkers met the statutory requirements." *Dole*, 923 F.2d at 184. There is "no reason to depart from the D.C. Circuit's well-reasoned interpretation" in *Dole* that "§ 1188 affords the DOL considerable latitude to promulgate regulations that protect American workers from being adversely affected by the issuance of H-2A visas." *Kansas*, 2024 WL 3938839, at *6.

DOL properly promulgated the Challenged Provisions in exercise of this broad rulemaking authority. *See id.* (summarizing Final Rule's rationale). DOL concluded that the Challenged Provisions are necessary to ensure that H-2A employment does not adversely affect the wages and working conditions of workers in the United States similarly employed for two principal reasons. First, for agricultural workers in the United States to meaningfully be able to assert their rights and seek better wages and working conditions, their H-2A program counterparts must be able to do the same without the grave and unique risks that retaliation means for them. While agricultural workers in the United States are not covered by the NLRA, they face relatively fewer risks if they, for example, come together to seek better pay (*e.g.*, they may face job loss at a given employer but not the inability to work for *any other* U.S. employer like their H-2A worker counterparts). If employers could turn to the relatively captive and vulnerable H-2A workforce to undermine efforts by workers in the United States to seek better wages and working conditions, the H-2A program would directly have an adverse effect on those workers in the United States. Second, the Challenged Provisions give workers employed under the H-2A program the tools necessary to self-advocate to ensure employers comply with the longstanding minimum terms and conditions of employment required under the H-2A program, which protections themselves are designed to prevent adverse effect.

**4.** The major questions doctrine does not suggest a different result. That doctrine—which is reserved for "extraordinary cases," involving assertions of "extravagant statutory power over the national economy" or "highly consequential power beyond what Congress could reasonably be understood to have granted," *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (citations omitted)—does not apply here, for several reasons.

First, DOL's promulgation of the Challenged Provisions is unlike the assertions of regulatory authority to which the Supreme Court has applied the doctrine, such as when: OSHA sought to adopt "a broad public health regulation" that would have required 84 million Americans to either get vaccinated or take other COVID-19 precautions in all workplaces with more than 100 employees, *NFIB v. OSHA*, 595 U.S. 109, 119 (2022); the CDC sought to regulate "the landlord-

tenant relationship" through a nationwide eviction moratorium, *Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021); the EPA contemplated regulation of power plants that would have resulted in a nationwide cap on carbon dioxide emissions and required restructuring the country's mix of electricity generation, *West Virginia*, 597 U.S. at 721; or the Department of Education sought to implement a student-loan forgiveness plan that was estimated to "cost taxpayers between $469 billion and $519 billion"—"nearly one-third of the Government's $1.7 trillion in annual discretionary spending." *Biden v. Nebraska*, 600 U.S. 482, 483, 502–03 (2023) (cleaned up).[11]

Second, as discussed above, *see supra* at 10–14, the grant of statutory authority here constitutes a "broad congressional delegation" to DOL to prevent adverse effects to workers in the United States. *Dole*, 923 F.2d at 187. That expansive delegation looks nothing like the grants of authority at issue in major questions cases. *See West Virginia*, 597 U.S. at 723 ("modest words," "vague terms," "subtle devices," and "oblique or elliptical language" are insufficient "in certain extraordinary cases" involving "[e]xtravagant grants of regulatory authority" (cleaned up)); *see also Biden v. Nebraska*, 600 U.S. at 494–95 ("modify" is a "term [that] carries 'a connotation of increment or limitation,'" and must be read to mean "to change moderately or in minor fashion"). DOL has consistently promulgated regulations to prevent adverse effects, including to ensure that employers provide the minimum terms and conditions of the H-2A program. *See supra* at 12–14. Thus, the Challenged Provisions do not represent a novel exercise of agency authority or rely on

[11] The Fourth Circuit decision Plaintiffs cite is similarly unhelpful. *See* Pls.' Mot. at 17–19 (discussing *N. Carolina Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*, 76 F.4th 291 (4th Cir. 2023)). First, that case did not involve a challenge to agency action; rather, an environmental group sued commercial shrimpers, alleging that they violated the Clean Water Act. *Id.* at 294. Second, Defendants disagree with the suggestion that the doctrine could apply beyond the narrow circumstances in which the Supreme Court has relied on it. *See id.* at 296. Finally, the facts are distinguishable. The Fourth Circuit determined the "economic and social consequences" of a ruling in the environmental group's favor "would be enormous," affecting "virtually every fisherman" in the country. *Id.* at 300 (stating that "[f]ishing in America generates hundreds of billions of dollars [and] employs millions of people"). And the statutory basis for the environmental group's challenge relied on "vague terms," such as the Clean Water Act's "definitional section defining 'pollutant.'" *Id.* at 301. As already explained, § 1188(a)(1) is clear as to DOL's obligation to prevent adverse effects. *See supra* at 10–14.

an "ancillary" statutory provision. *See West Virginia*, 597 U.S. at 724. "To the contrary . . . the relevant grant of authority at issue here at 8 U.S.C. 1188(a) is one that the Department has long relied on to establish program requirements that ensure that the employment of H-2A workers does not adversely affect the wages and working conditions of workers in the United States similarly employed, and is an area where the Department has significant expertise." 89 Fed Reg. at 33,995; *see also* 2010 H-2A Final Rule, 75 Fed. Reg. 6884, 6948 (Feb. 12, 2010); 2008 H-2A Final Rule, 73 Fed. Reg. 77,110, 77,159 (Dec. 18, 2008); 1987 H-2A IFR, 52 Fed. Reg. at 20,508, 20,513.

Indeed, from the H-2A program's inception, DOL has promulgated anti-retaliation and anti-discrimination provisions to facilitate a worker's rights to seek compliance with the baseline wages and working conditions required of H-2A employers. *See* 1987 H-2A IFR, 52 Fed. Reg. at 20,501, 20,517 (describing required anti-retaliation assurances originally promulgated at 20 C.F.R. § 655.103(g)); 1987 WHD IFR, 52 Fed. Reg. at 20,524-25 (describing anti-discrimination enforcement "deemed necessary by DOL to carry out its statutory responsibilities regarding enforcement of an H-2A employer's contractual obligations"). In promulgating the Challenged Provisions, "DOL explains that, despite previously-enacted protections, 'violations of the H-2A program requirements remain pervasive,' . . . [and the agency] is unequipped to 'investigate every farm on which H-2A workers are employed,' and thus, the DOL cannot take sufficient action to rectify H-2A employers' violations of the program's requirements." *Kansas*, 2024 WL 3938839, at *6 (quoting 89 Fed. Reg. at 33,989).

Accordingly, Defendants are entitled to summary judgment on Counts Two and Three.

**B. The Challenged Provisions Do Not Violate the NLRA.**

Plaintiffs point to no provision of the NLRA that prohibits affording agricultural workers employed under the H-2A program the protections found in the Challenged Provisions. Instead, Plaintiffs assert that the Challenged Provisions violate the NLRA simply because the NLRA itself

does not reach agricultural workers. *See* 29 U.S.C. § 152(3).[12] But that definitional provision does not preclude wholesale any regulation of agricultural employees' interactions with their employers. Courts have consistently held that those individuals that fall outside of the NLRA's "employee" definition may still be subject to, and protected by, other labor statutes and regulations—including those promulgated by other federal agencies. Defendants are therefore entitled to summary judgment on Count One.

**1.** The Challenged Provisions and the NLRA are distinct in important ways. On the one hand, Section 7 of the NLRA protects a covered employee's right "to self-organization, to form, join, or assist labor organizations, *to bargain collectively through representatives of their own choosing*, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157 (emphasis added). And Section 8, among other prohibitions and requirements, bars certain "unfair labor practice[s]," including employer interference in the exercise of a covered employee's § 7 rights, and requires employers to bargain collectively with employees' representatives. *Id.* § 158(a).

On the other hand, the Challenged Provisions simply expand the H-2A program's existing anti-discrimination provisions, enforced by WHD, to expressly protect from employer retaliation workers who engage in self-advocacy and self-organization. *See* 89 Fed. Reg. at 33,901, 34,005–06. The Challenged Provisions do not purport to bring *any* workers within the ambit of the NLRA and do not extend enforcement powers of the National Labor Relations Board to agricultural workers. The Challenged Provisions also "do[] not provide for collective bargaining rights," do

[12] The "NLRA's protections extend only to workers who qualify as 'employee[s]' under [29 U.S.C. § 152(3)]." *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 397 (1996). That section, which defines "employee" for NLRA purposes, does "not include any individual employed as an agricultural laborer." 29 U.S.C. § 152(3). While "[n]o definition of 'agricultural laborer' appears in the NLRA," the term "derive[s] its meaning from the definition of 'agriculture' supplied by" the Fair Labor Standards Act ("FLSA"). *Holly Farms*, 517 U.S. at 397; *see also* 29 U.S.C. § 203(f) (defining "agriculture" for FLSA purposes). "In construing the agricultural laborer exemption," the National Labor Relations Board looks to DOL, the agency "charged with the responsibility for and has the experience of administering the [FLSA]." *Holly Farms*, 517 U.S. at 405.

not "grant any rights to labor organizations," and do not "compel a worker to join a union." 89 Fed. Reg. at 33,991; *see also id.* at 33,994 ("rule does not require collective bargaining, employer recognition, or any other action by the employer in response to worker organizing."); *id.* at 34,006 (similar); *id.* at 34,005 (similar). Unlike the NLRA, the Challenged Provisions "do[] not require H-2A employers to recognize labor organizations or to engage in any collective bargaining activities." *Id.* at 33,901. Nor do the provisions provide for certification or representation elections, regulate unfair labor practices, or create any kind of labor relations board or process for handling representation cases or unfair labor practice complaints as does the NLRA.[13]

**2.** In any event, Plaintiffs point to no provision of the NLRA that prohibits or conflicts with the Challenged Provisions. Rather, Plaintiffs' entire argument rests on the flawed premise that the Challenged Provisions violate the NLRA because that act defines "employee" to "not include" "an agricultural laborer." 29 U.S.C. § 152(3); *see* Pls.' Mot. at 8–9. But that definitional provision does not bar DOL from issuing the Challenged Provisions.

In the context of labor regulations, federal agencies have, at a minimum, the same authority to regulate as do state agencies; that is, the room Congress left beyond the NLRA. Therefore, "[t]o determine whether [] tension [between a federal regulation and the NLRA] constitutes unacceptable conflict [courts] look to the extensive body of Supreme Court cases that mark out the boundaries of the field occupied by the NLRA." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1333-34 (D.C. Cir. 1996). "Since the progenitors of these cases originally arose in the context of state actions that were thought to interfere with the federal statute, they are referred to collectively as establishing the NLRA 'pre-emption doctrine.'" *Id.* at 1334. "The principles

[13] Similarly, the Challenged Provisions do not define or seek to prohibit unfair labor practices as do 29 U.S.C. § 158(a)(1), (2), and (3) of the NLRA. Similarly, the designation of representative provision, *see* 20 C.F.R. § 655.135(m), bears no resemblance to 29 U.S.C. § 159(a), which provides that certified representatives have exclusive rights to represent employees in collective bargaining over conditions of employment. And DOL did not adopt its initial proposal to protect secondary boycotts and pickets, explaining that such activities were regulated under NLRA §§ 158(b)(4)(i) and (ii). 89 Fed. Reg. at 34,006. The Final Rule expressly states that its provisions would only protect "otherwise lawful" concerted activity, 89 Fed. Reg. at 34,007.

developed, however, have been applied equally *to federal governmental behavior that is thought similarly to encroach into the NLRA's regulatory territory*." *Id.* (emphasis added); *see also UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 362–63 (D.C. Cir. 2003) (applying same analysis and refusing to enjoin DOL from enforcing an Executive Order ("EO") that required certain contractors to post notices informing employees of their right not to join union on the basis that the EO did not, under the relevant "preemption" doctrines, conflict with NLRA); 89 Fed. Reg. at 33,993–94 (describing additional cases).

Under this doctrine, the Challenged Provisions do not conflict with the NLRA. *See* 89 Fed. Reg. at 33,993 (explaining why the provisions are not preempted under *San Diego Building Trades Council v. Garmon,* 359 U.S. 236 (1959) or *Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Emp't Relations Comm'n,* 427 U.S. 132 (1976)). *Garmon* preemption does not prohibit these provisions because that doctrine "operat[es] only as to activities arguably protected or prohibited [by the NLRA], *not* to ones simply left alone, even if left alone deliberately." *UAW-Lab. Emp. & Training Corp.*, 325 F.3d at 364 (emphasis in original). And the Challenged Provisions cover activities that the NLRA "left alone": Congress neither provided concerted activity protections to agricultural workers nor prohibited such workers from engaging in concerted activity. Congress merely left alone the labor regulation of agricultural workers.[14]

*Machinists* preemption—which preempts regulation of employer or worker conduct that Congress intended be left "unregulated and to be controlled by the free play of economic forces," *see* 427 U.S. at 144—also does not bar the Challenged Provisions. "The *Machinists* rule creates a

[14] The relationship between federal minimum wage law and the Adverse Effect Wage Rates ("AEWR") is similar. Congress established the federal minimum wage when it passed the FLSA in 1938, three years after enacting the NLRA. Fair Labor Standards Act of 1938, ch. 676, § 6, 52 Stat. 1060, 1062–63 (1938). Most employees were covered by the FLSA's minimum wage requirement, but agricultural workers were excluded. *See id.* at § 13(a)(6), 52 Stat. at 1067. Some farmworkers, including certain employees on small farms, family members, local hand harvest laborers, migrant hand harvest workers under the age of sixteen and range production employees, continue to be excluded from the federal minimum wage, *see* 29 U.S.C. § 213(a)(6); 29 C.F.R. § 780.3, and all are still excluded from FLSA's overtime protections, *see* 29 U.S.C. § 213(b)(12). Neither fact restricts DOL's authority, in the more limited context of the H-2A program and its adverse-effects mandate, to require H-2A employers to pay the AEWR to such workers.

free zone from which all regulation, *whether federal or State*, is excluded." *Golden State Transit Corp.* v. *City of Los Angeles,* 493 U.S. 103, 111 (1989) (emphasis added) (citations omitted). "The Supreme Court has never found that Congress intended for the NLRA to occupy the 'field' with respect to the regulation of labor concerns." *Nat'l Ass'n of Mfrs.* v. *Perez,* 103 F. Supp. 3d 7, 25 (D.D.C. 2015); *see also id.* ("Congress did not intend for the NLRA to wholly occupy the field with respect to labor regulation and thereby foreclose all other regulation of that area.").

Plaintiffs concede that the NLRA does not prohibit all labor regulation of agricultural employees. *See* Pls.' Mot. at 9 ("[S]everal states allow farmworkers to collectively bargain and engage in concerted activity by statute."); *see also, e.g.*, California Agricultural Labor Relations Act, Cal. Lab. Code § 1140 *et seq.* That is unsurprising in light of the host of cases holding that the classes of employees excluded from the NLRA's "employee" definition may still be subject to other labor protections. *See UFW v. Ariz. Agric. Emp't Rels. Bd.,* 669 F.2d 1249, 1257 (9th Cir. 1982) (finding that "[n]othing in the [NLRA]" reflects that Congress intended to occupy "the entire field"; rather, "Congress's exclusion of agricultural employees from the Act" led to "precisely the opposite inference"); *see also Willmar Poultry Co. v. Jones,* 430 F. Supp. 573, 577–78 (D. Minn. 1977) ("The court has not been directed to, nor has it found, any explicit expression of a national labor policy that agricultural laborers be denied all representational rights."); *Chamber of Commerce v. City of Seattle,* 890 F.3d 769, 793 (9th Cir. 2018) (rejecting argument that independent contractors were intended to be free of regulation "federal or local").

Plaintiffs' argument thus rests on an incompatible tension. On the one hand, they argue that the NLRA's definitional provision is functionally equivalent to a provision that prohibits agricultural workers from engaging in concerted action. On the other hand, they concede that the NLRA does not preempt states from affording protections to agricultural workers to engage in concerted activities for mutual aid and protection. *See* Pls.' Mot. at 9. But if Congress had intended the NLRA's definitional provision to bear the meaning Plaintiffs ascribe to it, a state's attempt to extend concerted activity protections to agricultural workers would be (at least) "arguably . . . prohibited [by the NLRA]" and subject to *Garmon* preemption. *See UAW-Lab.*

*Emp. & Training Corp.*, 325 F.3d at 364. And this is not the case. Instead, courts have consistently held that the NLRA does *not* prohibit state or federal agencies from issuing labor regulations—like the Challenged Provisions—governing agricultural workers. *Chamber of Com.*, 74 F.3d at 1333–34; *accord Golden State Transit Corp.*, 493 U.S. at 111.

Although the Challenged Provisions utilize terminology from the NLRA with an established meaning, they do not purport in any way to grant collective bargaining rights or to apply the NLRA's enforcement framework to agricultural workers, as the preamble to the Rule expressly states. *See* 89 Fed. Reg. at 33,991, 33,992, 33,995, 34,008 & n.93. Rather, they simply prohibit those employers who choose to participate in the H-2A program from retaliating against workers who engage in certain self-advocacy efforts, making employers who violate the prohibition subject to the H-2A program's enforcement mechanisms and penalties/remedies—but not to any aspect of the NLRA's distinct enforcement regime.

**3.** Plaintiffs' reliance on *Alexander v. Sandoval* is misplaced because that case addressed an issue not presented here: whether an agency may create or imply a private right of action. *See* Pls.' Mot. At 17 (citing *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001)). In *Sandoval*, the question was whether disparate-impact regulations promulgated under Title VI of the Civil Rights Act of 1964 created a private right of action. 532 U.S. at 291 ("Both the Government and respondents argue that the *regulations* contain rights-creating language and so must be privately enforceable, but that argument skips an analytical step. . . . It is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress." (emphasis in original)).[15] There was no dispute about whether Congress could delegate to agencies the authority to promulgate regulations that affect regulated parties' substantive rights, as Congress did here in § 1188. Indeed, the regulations at issue did

[15] As the Supreme Court explained in *Sandoval*, the Court "[did] not inquire here whether the [disparate-impact regulation] was authorized by § 602 [of the Civil Rights Act]." 532 U.S. at 278. Rather, "[t]he petition for writ of certiorari raised, and [the Court] agreed to review, only the question posed in the first paragraph of this opinion: whether there is a private cause of action to enforce the regulation." *Id.*

affect the regulated parties' rights and obligations. *See Id.* at 280–82 (while "§ 601 of the Civil Rights Act] prohibits only intentional discrimination," the "regulations promulgated under § 602 . . . proscribe[d] activities that have a disparate impact on racial groups, even though such activities are permissible under § 601").

The Challenged Provisions are no different. They affect the substantive rights and obligations of H-2A employers and farmworkers—just as the AEWR and other regulations promulgated under § 1188 do. *See Kansas*, 2024 WL 3938839, at *6 (recognizing DOL's authority to promulgate AEWR regulations). But DOL is not asserting, and the parties are not contesting, that the Challenged Provisions seek to afford workers with a new, federal private cause of action to enforce the H-2A statute or regulations. Rather, the same longstanding enforcement mechanisms that apply to an H-2A employer's failure to pay the AEWR or provide meals, transportation, housing, or meet any other obligation also apply here: DOL may enforce the statutory and regulatory requirements. *See* 8 U.S.C. § 1188(g)(2).

Accordingly, Defendants are entitled to summary judgment on Count One.

**C. The Challenged Provisions Are Not Arbitrary and Capricious.**

Plaintiffs' arbitrary-and-capricious claim (Count Four) fares no better. Agency action must be upheld in the face of such a challenge so long as the agency "articulate[s] a satisfactory explanation for [the] action including a rational connection between the facts found and the choice made." *Little Sisters of Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 682 (2020) (citation omitted). A court's review is "narrow" and it "is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Under this standard, a court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). As the *Kansas* court already concluded regarding the Challenged Provisions, "'[DOL] is obliged to balance the competing goals of the [IRCA] . . . .' The DOL made its judgment call. And it provided sufficient reasoning for its decision." *Kansas*, 2024 WL 3938839, at *7 (alterations in

original) (quoting *Dole*, 923 F.2d at 186).

Plaintiffs assert that DOL improperly considered factors Congress did not intend for the agency to consider—namely, "granting H-2A workers NLRA-styled rights." Pls.' Mot. at 21. That is so, they say, because the Rule does not adequately explain its "obvious conflicts with the NLRA." *Id.* This argument largely duplicates Plaintiffs' argument that the Challenged Provisions violate the NLRA. For the same reasons, *see supra* at 16–22, that argument fails. In promulgating the Challenged Provisions, DOL did not weigh the benefits of unionization of the agricultural workforce writ large, and these provisions do "not require H-2A employers to recognize labor organizations or to engage in any collective bargaining activities such as those that may be required by the NLRA itself." 89 Fed. Reg. at 33,901. Instead, they require H-2A "employers to provide assurances that they will not intimidate, threaten, or otherwise discriminate against certain workers or others for engaging in 'activities related to self-organization,' including 'concerted activities for the purpose of mutual aid or protection relating to wages or working conditions.'" *Id.*

Plaintiffs also argue that the Final Rule does not adequately address a perceived conflict with state law that was raised in comments. Pls.' Mot. at 22–24. In Plaintiffs' words: "With respect to agricultural employees, North Carolina law bars parties from conditioning the terms or conditions of a contract or settlement agreement based on whether a farmer is a union employer and it prohibits farmers from checking off union dues from their employees' paychecks." Pls.' Mot. at 10 (citing N.C. Gen. Stat. § 95-79(b)); *see also id.* at 22 (asserting that this state law "prohibits the use of sue-and-settle tactics to force farms to unionize and agreements that require farmers to deduct union dues from their employee's paychecks").[16] Plaintiffs further argue that

[16] Although Plaintiffs describe the cited law as a "right to work" law, it does not appear to be such a law as commonly understood. Generally, "right to work" refers to an NLRA exception which permits states to enact laws prohibiting clauses in collective bargaining agreements which require union membership as a condition of employment, sometimes called "union-security agreements." See 29 U.S.C. § 164(b). Here, all parties agree that the NLRA does not apply to the agricultural workers covered by 20 C.F.R. § 655.135(h)(2), and that North Carolina law does not expressly authorize or prohibit any form of collective bargaining for farmworkers. Instead, N.C. Gen. Stat. § 95-79(b) is narrower in scope—it only prohibits agreements for mandatory dues deductions by

DOL failed to consider any implied conflict between the Challenged Provisions and state statutory schemes that are silent as to the right to engage in concerted activity. Pls. Mot. at 23–24. Thus, Plaintiffs argue, the Challenged Provisions "flip[] North Carolina's law upside down" and DOL did not adequately address this perceived conflict in the Final Rule." *Id*.

Plaintiffs are incorrect. First, with respect to the only North Carolina statute that Plaintiffs point to, regarding dues and settlements, DOL directly addressed this law in the preamble to the Final Rule and explained that "the Department does not believe that the North Carolina State law conflicts with the regulation" or vice versa, since "[t]he law does not appear to govern whether a farmworker in North Carolina may engage in protected concerted activity as outlined herein, or whether a North Carolina employer could discipline a worker for such activity." 89 Fed. Reg. at 34,008. Plaintiffs' second line of argument also fails, in which they essentially argue that because North Carolina law does not prohibit an H-2A employer from retaliating against a worker for engaging in concerted activity, DOL may not do so either. Plaintiffs cite nothing for the proposition that this "perceived conflict" constitutes impermissible preemption. Instead, and as Plaintiffs themselves acknowledge, *see* Pls.' Mot. at 23, DOL explained that the Department "is cognizant that over a dozen States have enacted laws that regulate organizing, collective bargaining, labor-management relations, overtime, heat stress, tools, and other issues affecting agricultural workers," 89 Fed. Reg. at 34,008. Thus, DOL "carefully crafted its new protections for concerted activity to avoid creating conflicts with existing State laws and regulations that provide for a system of collective bargaining for farmworkers and/or explicitly prohibit retaliation against farmworkers for exerting other rights guaranteed by State laws or regulations." *Id.*[17] Thus,

farmers, while permitting voluntary dues checkoff agreements. *See, e.g.*, *Farm Labor Organizing Committee v. Stein*, 56 F.4th 339, 345–51 (4th Cir. 2022). Thus, it does not appear to address union security agreements at all.

[17] Plaintiffs' contention that the Challenged Provisions are "in direct conflict to North Carolina's law," Pls.' Mot. at 23, is a red herring. Neither North Carolina nor the Challenged Provisions require any employer to engage in collective bargaining, to recognize any union, or to collect union dues. There can be no conflict where both provisions are silent. *See, e.g.*, 89 Fed. Reg. at 33,991, 33,994.

DOL provided a reasonable explanation in response to comments on whether the Challenged Provisions were intended to preempt state laws, and nothing more is required under the APA. *See Prometheus Radio Project*, 592 U.S. at 423.

## II. Plaintiffs Have Not Established that They Are Entitled to a Permanent Injunction

To the extent Plaintiffs seek a permanent injunction, they have not shown that they are entitled to such relief. A permanent injunction requires not only success on the merits, but also a demonstration that (1) the movant has suffered an irreparable injury; (2) remedies available at law are inadequate to compensate for that injury; (3) an equity remedy is warranted after balancing the hardships; and (4) the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Plaintiffs do not address these factors at all in their motion, and for that reason alone have not carried their burden of showing an entitlement to injunctive relief, and judgment should be entered for Defendants.

Plaintiffs cannot demonstrate irreparable harm, at least not for the expedited relief that they seek through an accelerated summary-judgment briefing schedule. A party requesting immediate injunctive relief "must generally show reasonable diligence." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018). "Courts have recognized that delay in seeking injunctive relief can be relevant to the irreparable harm inquiry." *Epic Tech, LLC v. Raleigh Startup Sols. LLC*, No. 5:23-cv-136-D, 2023 WL 4492495, at *3 (E.D.N.C. June 5, 2023) (collecting cases); *see also Vita-Mix Corp. v. Tristar Prod., Inc.*, No. 1:07-cv-275, 2008 WL 11383504, at *9 (N.D. Ohio Sept. 30, 2008) (collecting cases denying injunctions based on three-, five-, and nine-month delays). Plaintiffs could have filed a lawsuit at any point after the Final Rule was issued on April 29, 2024. Or they could have sought to join the ongoing *Kansas* litigation as plaintiffs or intervenors. Instead, Plaintiffs sat on their rights for five months since publication of the Final Rule, waiting until after the effective date of the Final Rule to sue, and now insist that the government and this Court go along with their preferred expedited review process. The Court should not treat Plaintiffs' manufactured emergency as requiring expedited relief.

The balance of hardships and the public interest also weigh against issuing an injunction here. When the government is a party, these two inquiries merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[T]here is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct that agency to develop." *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008). DOL determined that the Rule was in the public interest, and an injunction frustrating the enforcement of that rule would therefore harm the agency and the public interest. Specifically, DOL found that new protections for workers employed under the H-2A program would "help prevent exploitation and abuse of agricultural workers and ensure that unscrupulous employers do not financially gain from their violations or contribute to economic and workforce instability by circumventing the law," and that a lack of these protections "would adversely affect the wages and working conditions of workers in the United States similarly employed." 89 Fed. Reg. at 33,900. Because the statute expressly elevates consideration of "the wages and working conditions of workers in the United States," 8 U.S.C. § 1188(a)(1)(B), DOL's Final Rule aligns with Congress's stated policy goals and is therefore in the public interest.

## III. Vacatur Is Not Warranted, and Any Relief Should Be Limited to the Plaintiffs

In the event that the Court finds that Plaintiffs are entitled to relief, such relief should not include a universal remedy, *e.g.* vacatur or a nationwide injunction. The APA's provision for courts to "set aside" unlawful agency actions, 5 U.S.C. § 706(2), does not authorize the type of universal vacatur that Plaintiffs' motion suggests. As a matter of first principles, the "set aside" language in § 706(2) should not be read as authorizing remedies, which are governed by § 703 of the APA. Section 703 states that "[t]he form of proceeding for judicial review" of agency action is either a "special statutory review proceeding" or, in "the absence or inadequacy thereof," any "applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus." 5 U.S.C. § 703. Because Plaintiffs do not purport to identify any applicable "special statutory review proceeding," § 703 affords them only traditional equitable remedies such as the prohibitory injunction that the Court has already entered in this case. *See* S. Doc. No. 79-248, at 36-37 (1946) (referring to § 703 as governing remedies).

Section 706(2) does not address remedies at all. Rather, § 706(2) is properly understood as a rule of decision directing the reviewing court to disregard unlawful "agency action, findings, and conclusions" in resolving the case before it, consistent with basic principles of judicial review. Universal vacatur is therefore not an available remedy under the APA. *See United States v. Texas*, 599 U.S. 670, 693-99 (2023) (Gorsuch, J., concurring in the judgment) (joined by Justices Thomas and Barrett) (indicating that the APA does not require, or perhaps even permit, universal vacatur of agency actions); *Nuziard v. Minority Bus. Dev. Agency*, No. 4:23-CV-00278-P, 2024 WL 965299, at *41-43 (N.D. Tex. Mar. 5, 2024) (explaining that the "APA does not explicitly authorize vacatur").

Nothing in the APA suggests that relief should be universal. *See, e.g.*, *California v. Azar*, 911 F.3d 558, 582-84 (9th Cir. 2018) (vacating nationwide scope of injunction in facial challenge under the APA). No federal court had issued a nationwide injunction before Congress's enactment of the APA in 1946, nor would any court do so for more than fifteen years thereafter. *See Trump v. Hawaii*, 585 U.S. 667, 716 (2018) (Thomas, J., concurring). A court "do[es] not lightly assume that Congress has intended to depart from established principles" regarding equitable discretion. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). The APA's general instruction that unlawful agency action "shall" be "set aside," 5 U.S.C. § 706(2), does not mandate such a departure. The Supreme Court therefore has confirmed that, even in an APA case, "equitable defenses may be interposed," *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 155 (1967), such as a court's inherent power to define the scope of relief granted.

Universal vacatur would essentially have the same effect as a nationwide injunction. And many courts have cautioned district courts against nationwide injunctions. *See, e.g.*, *CASA de Md., Inc. v. Trump*, 971 F.3d 220, 261–62 (4th Cir. 2020); *Georgia v. President of the United States*, 46 F.4th 1283, 1306 (11th Cir. 2022). Relief should be no broader than necessary to remedy any harm demonstrated by Plaintiffs. *See Gill v. Whitford*, 585 U.S. 48, 73 (2018); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). "[N]ationwide injunctions or universal remedies . . . seem to take the judicial power beyond its traditionally understood uses, permitting district courts

to order the government to act or refrain from acting toward nonparties in the case. . . . Nationwide injunctions sometimes give States victories they did not earn . . . ." *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring); *see also Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) (questioning propriety of nationwide injunctions)); *see also Trump*, 585 U.S. at 720 (Thomas, J., concurring) (suggesting universal injunctions are inconsistent with "limits on equity and judicial power"); *Louisiana v. Becerra*, 20 F.4th 260, 264 (5th Cir. 2021) (staying nationwide injunction of COVID-19 vaccination mandates as "an issue of great significance" that "will benefit from the airing of competing views in our sister circuits" (citation omitted)). As Justice Gorsuch, joined by Justice Thomas, has explained, "[b]ecause plaintiffs generally are not bound by adverse decisions in cases to which they were not a party, there is a nearly boundless opportunity to shop for a friendly forum to secure a win nationwide." *DHS*, 140 S. Ct. at 601 (Gorsuch, J., concurring). This creates risks of "conflicting nationwide injunctions," with "asymmetric" stakes where "a single successful challenge is enough to stay the challenged rule across the country." *Id.*; *see also Trump*, 585 U.S. at 713 (Thomas, J., concurring) (universal relief "take[s] a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch.").

Nationwide relief would be particularly problematic here because three other district courts in different circuits are considering challenges to the same Rule. *See Kansas v. DOL*, No. 2:24-cv-76-LGW-BWC (S.D. Ga.); *Barton v. DOL*, No. 5:24-cv-24 (E.D. Ky.); *Int'l Fresh Produce Ass'n v. DOL*, No. 1:24-cv-309-HSO-BWR (S.D. Miss.). A nationwide remedy would render the *Kansas* Order and any orders that might follow in the other courts meaningless as a practical matter. There is no reason why Plaintiffs' disagreements with the Rule should govern the rest of the country. *See California*, 911 F.3d at 583 ("The detrimental consequences of a nationwide injunction are not limited to their effects on judicial decisionmaking. There are also the equities of non-parties who are deprived the right to litigate in other forums."); *see also id.* at 582–84 (vacating nationwide scope of injunction in facial challenge under the APA).

Relief should be tailored to remedy any actual harm demonstrated by Plaintiffs. *See Gill*, 585 U.S. at 73; *Madsen*, 512 U.S. at 765. Accordingly, should the Court find that Plaintiffs are entitled to relief, an injunction or declaratory judgment as to Plaintiffs alone would provide complete redress, and any broader relief would be inappropriate.

## V. If the Court Grants Relief to Plaintiffs, the Court Should Sever Any Provisions Found to Be Unlawful from the Remainder of the Final Rule.

In the event that the Court finds that any Plaintiffs are entitled to relief, the Court should sever the provisions that it finds to be unlawful from the remainder of the Final Rule. In their motion for summary judgment, Plaintiffs refer generally to the "Final Rule" as a whole, but raise merits arguments only about the protections afforded under 20 C.F.R. § 655.135(h)(2) (and the parallel provision at 29 C.F.R. § 501.4(a)(2)) and 20 C.F.R. § 655.135 (m) and (n). The Rule contains many provisions that Plaintiffs do not even discuss,[18] and, in that regard, Plaintiffs have provided no reason why those provisions are unlawful or why allowing those provisions to take effect would produce the type of harm necessary to support a permanent injunction. Accordingly, even if Plaintiffs prevail here, they are not entitled to summary judgment as to those provisions or any other provision of the Final Rule beyond 20 C.F.R. § 655.135(h)(2), (m), and (n) and 29 C.F.R. § 501.4(a)(2).

"Whether the offending portion of a regulation is severable depends upon the intent of the agency *and* upon whether the remainder of the regulation could function sensibly without the stricken provision." *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001) (citing *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988)). In the Final Rule, the Department made clear its intent that the various regulatory provisions be severable from each other, and further explained that the diverse regulatory provisions established by the Rule would function

[18] *See, e.g.*, 20 C.F.R. § 655.122(h)(4)(ii) (requiring use of seatbelts in vehicles); 20 C.F.R. § 655.122(n) (providing definition of termination "for cause"); 20 C.F.R. § 655.135(o) (prohibiting employers from confiscating or withholding workers' passports); 20 C.F.R. § 655.137 (requiring employers to provide certain information about foreign labor recruitment activities); 20 C.F.R. § 655.182 (modifications to debarment process); 20 C.F.R. §§ 658.500–04 (modifications to discontinuation process); 20 C.F.R. § 655.120(b)(2), (b)(3) (changes to effective date of the annual AEWR calculation).

sensibly should any particular provision or provisions be invalidated. *See* 89 Fed. Reg. at 33,952 ("The worker voice and empowerment provisions adopted in this rule, along with other provisions, provide layers of protection to prevent adverse effect, and these layers of protection would remain workable and effective at preventing adverse effect even if any individual provision is invalidated."). "[A]n express severability provision . . . plainly demonstrates the agency's actual intent regarding partial invalidation." *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Nat'l Lab. Rels. Bd.*, 466 F. Supp. 3d 68, 98 (D.D.C.), *order amended on reconsideration*, 471 F. Supp. 3d 228 (D.D.C. 2020), *aff'd in part, rev'd in part and remanded*, 57 F.4th 1023 (D.C. Cir. 2023). Accordingly, the Final Rule is severable and the Court should at most enjoin only those provisions it finds unlawful, severing the remainder of the Final Rule.

## CONCLUSION

The Court should grant summary judgment in favor of Defendants and deny Plaintiffs' motion for summary judgment. In the event the Court finds relief warranted for Plaintiffs, any such relief should be limited to the Plaintiffs and to the Challenged Provisions found to be unlawful.

DATED: November 22, 2024 Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JULIE STRAUS HARRIS
Assistant Branch Director

/s/ *Michael P. Clendenen*
MICHAEL P. CLENDENEN
MICHAEL J. GAFFNEY
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Phone: (202) 305-0693
E-mail: michael.p.clendenen@usdoj.gov

*Counsel for Defendants*