IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:24-CV-00527-FL

| | | |
|---|---|---|
| NORTH CAROLINA FARM BUREAU FEDERATION, INC.; HIGHT FAMILY FARMS, LLC; and TRIPLE B FARMS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| UNITED STATES DEPARTMENT OF LABOR; LORI FRAZIER BEARDEN, in her official capacity as Acting Assistant Secretary of the United States Department of Labor; and DONALD M. HARRISON, III, in his official capacity as Acting Administrator, Wage & Hour Division of the United States Department of Labor,[1] | ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | ORDER |
| - - - | ) ) | |
| JUAN HERNANDEZ VEGA, ODIN MILLARD, DEXTER STARKS, WILLIE SHELLY, FARMWORKER JUSTICE, UFW FOUNDATION, | ) ) ) ) ) | |
| Intervenor Defendants, | ) ) | |
| - - - | ) ) | |
| AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS, | ) ) ) ) | |
| Amicus. | ) | |

---

[1] Plaintiffs brought this suit against Jessica Looman, the former Administrator of the Wage & Hour Division, and Jose Javier Rodriguez, the former Assistant Secretary of the Department of Labor. However, Donald M. Harrison, III is now the Acting Administrator of the Wage & Hour Division, and Lori Frazier Bearden is now the Acting Assistant Secretary. As such, Harrison is automatically substituted as a party in place of Looman, and Bearden is substituted in place of Rodriguez. Fed. R. Civ. P. 25(d). The clerk is DIRECTED to amend the docket to reflect this change.

This matter is before the court on the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56 (DE 11, 35) as well as motion to intervene pursuant to Federal Rule of Civil Procedure 24(b) filed by intervenor defendants Juan Hernandez Vega ("Vega"), Odin Millard ("Millard"), Dexter Starks ("Starks"), Willie Shelly ("Shelly"), Farmworker Justice, and the UFW Foundation (collectively "intervenor defendants") (DE 25). The issues have been briefed fully and are ripe for decision. For the following reasons, the motion to intervene is denied, plaintiffs' motion for summary judgment is denied, and defendants' motion for summary judgment is granted.

## STATEMENT OF THE CASE

Plaintiffs North Carolina Farm Bureau Federation, Inc. ("Farm Bureau"), Hight Family Farms, and Triple B Farms initiated this matter with verified complaint filed September 13, 2024. They seek to enjoin defendants, the United States Department of Labor ("Labor") and two of its administrators, from implementing or enforcing their final rule, Improving Protections for Workers in Temporary Agricultural Employment in the United States, 89 Fed. Reg. 33,898 (the "Final Rule"), published April 29, 2024, and to have the Final Rule held unlawful, vacated, and set aside under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ( the "APA").

Before expiration of defendants' time to respond to complaint, plaintiffs filed the instant motion for summary judgment October 14, 2024, relying on statement of material facts and declaration of Michael Paul Sherman, assistant to the president of plaintiff Farm Bureau. After extension of time, defendants responded in opposition and filed the instant cross-motion for summary judgment November 22, 2024, to which plaintiffs have responded. Also on November 22, 2024, defendants filed answer and stipulation regarding the administrative record.

Intervenor defendants filed motion for permissive intervention November 8, 2024, relying on declarations of Vega, Millard, Starks, Shelly, Farmworker Justice Legal Director Lori J. Johnson, and UFW Foundation Director of Government Affairs Diego Iñiguez-López. Defendants responded in opposition to intervention November 22, 2024, and intervenor defendants replied. Intervenor defendants also filed November 22, 2024, proposed response to plaintiffs' motion for summary judgment, relying on statement of material facts.

With leave of court and consent of all parties, the American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO") as amicus curiae filed brief in support of defendants' opposition to plaintiffs' motion for summary judgment and defendants' cross-motion for summary judgment December 10, 2024.

## STATUTORY AND REGULATORY FRAMEWORK

The Final Rule affects agricultural workers temporarily employed through the H-2A visa program, agricultural employees engaged in corresponding employment,[2] and their employers. Therefore, to provide context to the court's statement of facts, the court first sets forth a summary of the statutory and regulatory framework regarding employment of temporary agricultural workers.

The H-2 nonimmigrant visa program was established by the Immigration and Nationality Act of 1952, Pub. L. No. 82-414, 66 Stat. 163 (codified as amended at 8 U.S.C. §§ 1101-1537) (the "INA"), under which the United States Attorney General may issue a temporary visa to a nonresident alien to perform temporary labor or services if domestic workers cannot be found to do so. Congress amended this program with the Immigration Reform and Control Act of 1986,

---

[2] "Corresponding employment" refers to "employment of workers who are not H-2A workers by an employer who has an approved Application for Temporary Employment Certification in any work included in the job order, or in any agricultural work performed by the H-2A workers." 20 C.F.R. § 655.103.

Pub. L. No. 99-603, 100 Stat. 3359 (codified in scattered sections of 8 U.S.C.) (the "IRCA"), which inter alia split the H-2 designation into H-2A for agricultural and H-2B for non-agricultural workers. See 8 U.S.C. § 1101(a)(15)(H)(ii). The IRCA also codified a certification process, conditioning the Attorney General's approval of an H-2A visa on the Secretary of Labor's (the "Secretary's") issuance of certification that "A) there are not sufficient workers who are able, willing, and qualified . . . , and B) the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed." Id. § 1188(a)(1). These are called temporary employment certifications or temporary labor certifications.

The Secretary may not issue a temporary labor certification to a prospective H-2A employer if any of the conditions listed in §1188(b) apply concerning strikes, program debarment, workers' compensation assurances, or positive recruitment efforts. On the other hand, the Secretary must issue a temporary labor certification if "the employer has complied with the criteria for certification (including criteria for the recruitment of eligible individuals as prescribed by the Secretary)," and "the employer does not actually have, or has not been provided with referrals of, qualified eligible individuals who have indicated their availability to perform such labor or services on the terms and conditions of a job offer which meets the requirements of the Secretary." Id. § 1188(c)(3)(A). A labor certification remains effective only if the employer "offer[s] to provide benefits, wages, and working conditions required pursuant to [§ 1188] and regulations." Id. § 1188(c)(3)(B)(i).

Additionally, the Secretary "is authorized to take such actions, including imposing appropriate penalties and seeking appropriate injunctive relief and specific performance of

4

contractual obligations, as may be necessary to assure employer compliance with terms and conditions of employment under [§ 1188]." Id. § 1188(g)(2).

The regulatory standards and procedures applicable to the certification and employment of H-2A workers are set out in 20 C.F.R.. §655, subpart B, and 29 C.F.R. § 501.

## STATEMENT OF FACTS

On September 15, 2023, Labor published a Notice of Proposed Rulemaking, Improving Protections for Workers in Temporary Agricultural Employment in the United States, 88 Fed. Reg. 63750 (Sept. 15, 2023) (the "Notice"), which proposed various revisions to the H-2A visa program that would "focus on strengthening protections for temporary agricultural workers and enhancing [Labor's] capabilities to monitor program compliance and take necessary enforcement actions against program violators." Notice, 88 Fed. Reg. 63750.[3] These revisions are summarized as: 1) "Protections for Workers Who Advocate for Better Working Conditions and Labor Organizing Activities," 2) "Clarification of Justifiable Termination for Cause," 3) "Immediate Effective Date for Updated AEWRs,"[4] 4) "Enhanced Transparency for Job Opportunity and Foreign Labor Recruitment," 5) "Enhanced Transparency and Protections for Agricultural Workers," and 6) "Enhanced Integrity and Enforcement Capabilities." Id. at 63753-55. Labor received nearly 13,000 comments in response to the Notice, including opposing comments submitted by plaintiffs. Final Rule, 89 Fed. Reg. 33900; (Plfs' St. Mat. Facts ("Plfs' SMF") (DE 12) ¶18).

---

[3]     The parties stipulate that for the purpose of ruling on the instant cross motions for summary judgment, the relevant materials from the administrative record in this matter are the Notice; the comments to such notice, available at https://www.regulations.gov/docket/ETA-2023-003; and the Final Rule. (Stip. Admin. R. (DE 38)); see Camp v. Pitts, 411 U.S. 138, 142 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court").

[4]     "AEWR" refers to the "Adverse Effect Wage Rate," which is "the minimum wage rate [Labor] has determined must be offered and paid to every H-2A worker" and worker in corresponding employment "to ensure that the wages of similarly employed U.S. workers will not be adversely affected." 20 C.F.R. § 655.1300(c).

On April 29, 2024, Labor published the Final Rule in the Federal Register. 89 Fed. Reg. 33898. The first summary category was changed to "Protections for Worker Voice and Empowerment," but the other summary provisions from the Notice remained largely unchanged. Id. at 33901-03. The Final Rule took effect on June 28, 2024, but due to the transition period necessary for Labor to update application forms and corresponding internal procedures, it applied to H-2A employers submitting H-2A job applications on or after August 29, 2024. Id. at 33898, 33904.

Although plaintiffs' complaint challenges the entirety of the Final Rule, they raise arguments only against the amendments to 20 C.F.R. § 655.135(h) (and the parallel provision at 29 C.F.R. § 501.4(a)) and 20 C.F.R. § 655.135(m) and (n), related to "Protections for Worker Voice and Empowerment." Under the Final Rule, the challenged portions of § 655.135 read:

> (h) <u>No unfair treatment</u>. (1) The employer has not and will not intimidate, threaten, restrain, coerce, blacklist, discharge or in any manner discriminate against, and has not and will not cause any person to intimidate, threaten, restrain, coerce, blacklist, or in any manner discriminate against, any person who has:
>
> (i) Filed a complaint under or related to 8 U.S.C. 1188 or this subpart or any Department regulation in this chapter or 29 CFR part 501 promulgated under 8 U.S.C. 1188;
>
> (ii) Instituted or caused to be instituted any proceeding under or related to 8 U.S.C. 1188 or this subpart or any Department regulation in this chapter or 29 CFR part 501 promulgated under 8 U.S.C. 1188;
>
> (iii) Testified or is about to testify in any proceeding under or related to 8 U.S.C. 1188 or this subpart or any Department regulation in this chapter or 29 CFR part 501 promulgated under 8 U.S.C. 1188;
>
> (iv) Consulted with an employee of a legal assistance program or an attorney on matters related to 8 U.S.C. 1188 or this subpart or any Department regulation in this chapter or 29 CFR part 501 promulgated under 8 U.S.C. 1188;
>
> (v) Consulted with a key service provider on matters related to 8 U.S.C. 1188 or this subpart or any Department regulation in this chapter or 29 CFR part 501 promulgated under 8 U.S.C. 1188;

(vi) Exercised or asserted on behalf of themself or others any right or protection afforded by 8 U.S.C. 1188 or this subpart or any Department regulation in this chapter or 29 CFR part 501 promulgated under 8 U.S.C. 1188; or

(vii) Filed a complaint, instituted, or caused to be instituted any proceeding; or testified, assisted, or participated (or is about to testify, assist, or participate) in any investigation, proceeding, or hearing under or related to any applicable Federal, State, or local laws or regulations, including safety and health, employment, and labor laws.

(2) With respect to any person engaged in agriculture as defined and applied in 29 U.S.C. 203(f), the employer has not and will not intimidate, threaten, restrain, coerce, blacklist, discharge or in any manner discriminate against, and has not and will not cause any person to intimidate, threaten, restrain, coerce, blacklist, or in any manner discriminate against, any person because such person:

(i) Has engaged in activities related to self-organization, including any effort to form, join, or assist a labor organization; or has engaged in other concerted activities for the purpose of mutual aid or protection relating to wages or working conditions; or has refused to engage in any or all of such activities; or

(ii) Has refused to attend an employer sponsored meeting with the employer or its agent, representative or designee, if the primary purpose of the meeting is to communicate the employer's opinion concerning any activity protected by this subpart; or has refused to listen to employer-sponsored speech or view employer-sponsored communications, the primary purpose of which is to communicate the employer's opinion concerning any activity protected by this subpart.

\* \* \*

(m) <u>Designation of representative</u>. With respect to any H–2A worker or worker in corresponding employment engaged in agriculture as defined and applied in 29 U.S.C. 203(f), employed at the place(s) of employment included in the Application for Temporary Employment Certification, the employer must permit a worker to designate a representative to attend any investigatory interview that the worker reasonably believes might result in disciplinary action and must permit the worker to receive advice and active assistance from the designated representative during any such investigatory interview.  Where the designated representative is present at the worksite at the time of the investigatory interview, the employer must permit the representative to attend the investigatory interview in person.  Where the designated representative is not present at the time and place of the investigatory interview, the employer must permit the representative to attend the investigatory interview remotely, including by telephone, videoconference, or other means.

(n) <u>Access to worker housing</u>.  Workers residing in employer-furnished housing must be permitted to invite, or accept at their discretion, guests to their living quarters and/or the common areas or outdoor spaces near such housing during time that is outside of the workers' workday subject only to reasonable restrictions designed to protect worker safety or prevent interference with other workers' enjoyment of these areas.  Because workers' ability to accept guests at their discretion depends on the ability of potential guests to contact and seek an invitation from those workers, restrictions impeding this ability to contact and seek an invitation will be evaluated as restrictions on the workers' ability to accept guests.

89 Fed. Reg. 34062-63.

To justify its inclusion of these amendments in the Final Rule, Labor asserted "that these provisions, which safeguard worker voice and empowerment, will prevent adverse effect on similarly employed workers in the United States by alleviating some of the barriers H-2A workers face when raising complaints about violations of their rights under the program and advocating regarding working conditions."  <u>Id.</u> at 33991.  Labor also stated that

the relevant grant of authority at issue here at 8 U.S.C. § 1188(a) is one that [Labor] has long relied on to establish [H-2A] program requirements that ensure that the employment of H-2A workers does not adversely affect the wages and working conditions of workers in the United States similarly employed and is an area where the Department has significant expertise.

<u>Id.</u> at 33995.

B.      Parallel Litigation

On June 10, 2024, 17 states, a Georgia farm, and the Georgia Fruit and Vegetable Growers Association, challenged the Final Rule in the United States District Court for the Southern District of Georgia.  <u>See generally</u> <u>Kansas v. U.S. Dep't of Labor</u>, 749 F. Supp. 3d 1363 (S.D. Ga. 2024) (hereinafter, "<u>Kansas</u>").  In their complaint, the <u>Kansas</u> plaintiffs alleged that the Final Rule "illegally provides collective bargaining rights to agricultural migrant workers employed in the United States under the H-2A visa program."  <u>Id.</u> at 1369.  They sought a preliminary injunction to delay implementation of the Final Rule nationwide.  <u>Id.</u>  Concluding that the plaintiffs were

likely to succeed on the merits of their claims, the court preliminarily enjoined enforcement of the Final Rule within the plaintiff states and against the plaintiff farm and organization August 26, 2024. Id. at 1378, 1383.

In response to the Kansas order, on August 28, 2024, Labor posted a notice on its website, stating that it "will delay updating its FLAG[5] system to implement revised H-2A job order and application forms associated with the [Final] Rule, originally scheduled to begin at 7:00 p.m. Eastern Daylight Time on August 28, 2024, until further notice." (Plfs' SMF ¶30). However, on September 10, 2024, Labor announced that it would begin requiring compliance with the Final Rule for all H-2A job orders submitted after September 12, 2024, in the areas of the country not impacted by the ruling in Kansas. (Id. ¶30).

Because the preliminary injunction order in Kansas did not extend to North Carolina, plaintiffs were subject to the Final Rule at the time they initiated the instant action September 13, 2024. (Id.). Similarly, plaintiffs here are not subject to a party-specific preliminary injunction issued in favor of farmers, growers, related associations, and four states in Barton v. U.S. Dep't of Labor, 757 F. Supp. 3d 766, 794-95 (E.D. Ky. 2024) ("Barton").[6]

However, in Int'l Fresh Produce Ass'n v. U.S. Dep't of Labor, 758 F. Supp. 3d 575 (S.D. Miss. 2024) (hereinafter "Int'l Fresh Produce"), the court stayed the effective date of the Final Rule's amendments to 20 C.F.R. § 655.135(h)(2), (m) until the conclusion of proceedings in that case pursuant to 5 U.S.C. § 705. 758 F. Supp. 3d at 594. Because the court determined that

---

[5]     "FLAG" is a reference to the Foreign Labor Application Gateway, the online portal through which H-2A employers submit applications for temporary labor certifications. See 89 Fed. Reg. 33904.

[6]     North Carolina Growers' Association, Inc. ("NCGA") is a party to the Barton case, and its members are subject to the injunction issued therein. See Barton, 757 F. Supp. 3d at 794-95. Plaintiffs Hight Family Farms and Triple B Farms allege they are not members of NCGA, and plaintiff Farm Bureau alleges at least some of its members are not members of NCGA. (See Compl. (DE 1) ¶ 5).

"nothing in the text of Section 705, nor of Section 706, suggests that either preliminary or ultimate relief under the APA needs to be limited to Plaintiffs or its members," it did not limit application of its stay to the parties in that case.  Id. at 593 (quoting Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ., 98 F.4th 220, 255 (5th Cir. 2024)).  According to that court, "a stay is the temporary form of vacatur."  Id. (quoting All. For Hippocratic Med. v. U.S. Food & Drug Admin. 78 F.4th 210, 254 (5th Cir. 2023), rev'd on other grounds, 602 U.S. 367 (2024)).  Therefore, according to the court in Int'l Fresh Produce, Labor currently has no authority to enforce the Final Rule's amendments to 20 C.F.R. § 655.135(h)(2), (m), related to "Protections for Worker Voice and Empowerment" against anyone, including plaintiffs here.  All other portions of the Final Rule remain in effect against plaintiffs.

## COURT'S DISCUSSION

The court considers intervenor defendants' motion to intervene before turning to the cross motions for summary judgment.

A.      Motion to Intervene (DE 25)

1.      Standard of Review

Federal Rule of Civil Procedure 24(b)(1)(B) allows that on timely motion, the court may permit anyone to intervene who "has a claim or defense that shares with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b)(1)(B).  The court enjoys substantial discretion over allowing or rejecting motions to intervene under Rule 24(b).  Hill v. Western Elec. Co., 672 F.2d 381, 385–86 (4th Cir.1982); Black v. Central Motor Lines, Inc., 500 F.2d 407, 408 (4th Cir.1974).  However, "[i]n exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."  Fed. R. Civ. P. 24(b)(3).

The language of Rule 24(b)(3) "is directive, instructing courts to consider the factors of

undue delay and prejudice in exercising their discretion about permissive intervention, but findings on those factors are not determinative." McHenry v. Comm'r, 677 F.3d 214, 222 (4th Cir. 2012) (emphasis in original). "Regardless of what a court concludes in considering these factors, it may still either grant or deny intervention." Id.

In contrast, "[t]here are three requirements for intervention as of right" under Rule 24(a)(2). N.C. State Conf. of the NAACP v. Berger, 970 F.3d 489, 502 (4th Cir. 2020), aff'd on reh'g, 999 F.3d 915 (2021), rev'd on other grounds, 597 U.S. 179 (2022). "The moving party must show that (1) it has an interest in the subject matter of the action, (2) disposition of the action may practically impair or impede the movant's ability to protect that interest, and (3) that interest is not adequately represented by the existing parties." Id.

2.      Analysis

Intervenor defendants are farmworkers working on H-2A visas, domestic farmworkers in corresponding employment, and two non-profit organizations serving farmworkers. (DE 26 at 3-6).[7] They seek permission to intervene under Rule 24(b) or, in the alternative, request that the court treat their motion as a standby or conditional application for leave to intervene as of right under Rule 24(a) and grant permission to file amici briefs. The court addresses each alternative in turn.

When considering whether a motion to intervene is timely, the court must consider three factors: "first, how far the underlying suit has progressed; second, the prejudice any resulting delay might cause the other parties; and third, why the movant was tardy in filing its motion." Alt v. U.S. Env't Prot. Agency, 758 F.3d 588, 591 (4th Cir. 2014). Here, where intervenor defendants

---

[7]      Page numbers specified in citations to the record in this order refer to the page number of the document designated in the court's case management and electronic case filing (CM/ECF) system, and not to page numbering, if any, specified on the face of the underlying document.

11

filed motion to intervene before defendants' deadline to respond to the complaint, all three factors weigh in favor of finding their motion timely.

Intervenor defendants contend their defenses share common questions of law with the main action here, and no party objects to this contention.

Although this case involves no discovery and intervenor defendants filed their proposed response to plaintiffs' motion for summary judgment and accompanying statement of material facts, adding parties to a case almost always results in some delay. See 7C Charles Alan Wright et al., Federal Practice and Procedure § 1913 (3d ed. 2007). However, there is no indication that such delay here is necessarily undue.

Defendants mistakenly argue that intervention must be denied "when the movant's interests are 'adequately addressed by the government's representation.' " (Defs' Opp. Mot. Interv. (DE 39) at 3 (quoting Democratic Party of Va. v. Brink, No. 3:21-cv-756-HEH, 2022 WL 287929, at *3 (E.D. Va. Jan. 31, 2022))). While this is true of intervention as of right under Rule 24(a), no such requirement of inadequate representation exists for permissive intervention under Rule 24(b). However, the adequacy of the government's representation here does indicate that allowing intervention in this case is not necessary. A court does not err in exercising its discretion by denying permissive intervention when delay would result without a corresponding benefit to the process, the litigants, or the court. Stuart v. Huff, 706 F.3d 345, 355 (4th Cir. 2013). This is especially true where an existing party zealously pursues the same ultimate objectives as a movant. Id. Defendants here oppose intervention, arguing that intervenor defendants' participation would be duplicative.

Where defendants are pursuing the same ultimate objectives and where intervenor defendants point to no case in which permissive intervention was allowed over the objection of

the active parties on the same side, the court in its discretion denies intervenor defendants' motion for permissive intervention.

In the alternative, intervenor defendants request the court consider their motion as "a standby or conditional application for leave to intervene as-of-right and ask this Court to defer consideration of the question of adequacy of representation under Fed. R. Civ. P. 24(a)(2) until such time as the Government Defendants no longer adequately represent [intervenor defendants'] interests." (Mot. Perm. Interv. (DE 25) at 1-2 (quoting Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs, 101 F.3d 503, 509 (7th Cir. 1996))). Neither Rule 24 nor Fourth Circuit cases interpreting it mention "standby or conditional" approval in instances where a movant's interests may cease to be adequately represented at some unknown future time.

Where intervenor defendants cite no court in this circuit adopting the concept of standby intervention, the court declines to do so today. Accordingly, that portion of their alternative motion is denied without prejudice. Should intervenor defendants determine that their interests are not adequately represented by defendants, they then may seek to intervene as of right under Rule 24(a). See N.C. State Conf. of NAACP, 999 F.3d at 938 (noting that a party's abandonment of a defense represents a changed circumstance on which a district court may reconsider Rule 24(a)(2) intervention).

However, the court will grant intervenor defendants' motion in further alternative part to allow them to participate as amici in support of defendants. "[A]llowing a proposed intervenor to file an amicus brief is an adequate alternative to permissive intervention." McHenry, 677 F.3d at 227. "While a would-be intervenor may prefer party status to that of friend-of-court, the fact remains that amici often make useful contributions to litigation." Stuart, 706 F.3d at 355. "In reviewing an agency action," a district court must "consider the record made before the agency at

13

the time the agency acted, so post-hoc rationalizations have traditionally been found to be an inadequate basis for review." Roe v. U.S. Dep't of Def., 947 F.3d 207, 220 (4th Cir. 2020). Thus, to the extent that the affected community's insight is pertinent to this administrative review action, any contribution intervenor defendants could make to this court's understanding of the issues can be gained by adding them as amici curiae. Intervenor defendants' proposed response to plaintiffs' motion for summary judgment (DE 33) shall be considered an amicus brief in support of defendants. In addition, the court will direct the clerk to change the designation of each intervenor defendant on the docket to "amicus."

B.    Cross-Motions for Summary Judgment

    1.    Standard of Review

    Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On cross-motions for summary judgment, the court "consider[s] each motion separately on its own merits to determine whether [any] of the parties deserves judgment as a matter of law." Defs. of Wildlife v. N.C. Dep't of Transp., 762 F.3d 374, 392 (4th Cir. 2014).[8]

    Under the APA, the court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

    To determine whether agency action is in excess of statutory jurisdiction, the court "must exercise independent judgment in determining the meaning of statutory provisions." Loper Bright

---

[8]    Throughout this order, internal citations and quotation marks are omitted unless otherwise specified.

<u>Enters. v. Raimondo</u>, 603 U.S. 369, 394 (2024).[9]  It may "seek aid from the interpretations of those responsible for implementing particular statutes," and "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful." <u>Id.</u>  "But courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous."  <u>Id.</u> at 413.

2.      Analysis

Plaintiffs argue the Final Rule must be set aside because it violates the major questions doctrine, exceeds Labor's authority under the IRCA, is the result of arbitrary and capricious agency action, and conflicts with the National Labor Relations Act of 1935, 29 U.S.C. § 151 et seq. ("NLRA").  The court addresses each argument in turn.

a.      Major Questions Doctrine

Plaintiffs argue that the major question doctrine applies and bars enforcement of the Final Rule.  The court disagrees.

Under the major questions doctrine, a federal agency must identify "clear congressional authorization" to support its actions "in extraordinary cases when the history and breadth and economic and political significance of the action at issue gives [the court] a reason to hesitate before concluding that Congress meant to confer such authority."  <u>N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC</u>, 76 F.4th 291, 296 (4th Cir. 2023) (citing <u>West Virginia v. EPA</u>, 597 U.S. 697, 700 (2022)).  "The doctrine serves as an interpretive tool reflecting 'common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency.' "  <u>Biden v. Nebraska</u>, 600 U.S. 477, 511 (2023)

---

[9]      "In <u>Loper Bright</u>, the Supreme Court overturned the <u>Chevron</u> doctrine" of deferring to an agency's interpretation of ambiguous statutory language.  <u>Molina-Diaz v. Bondi</u>, 128 F.4th 568, 574 (4th Cir. 2025); <u>see generally</u> <u>Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.</u>, 467 U.S. 837 (1984).

15

(Barrett, J., concurring) (quoting <u>FDA v. Brown & Williamson Tobacco Corp.</u>, 529 U.S. 120, 133 (2000). Although "[t]he doctrine's boundaries remain hazy," the court looks to the Supreme Court's cases for "helpful guideposts." <u>N.C. Coastal Fisheries</u>, 76 F.4th at 296. The "more indicators from [the Supreme Court's] previous major questions cases are present, the less likely it is that Congress would have delegated the power to the agency without saying so more clearly." <u>Nebraska</u>, 600 U.S. at 521 (Barrett, J., concurring).

Examples of agency actions that violate the major questions doctrine include the Environmental Protection Agency's attempt to regulate greenhouse gas emissions from power plants through generation-shifting, which would "substantially restructure the American energy market," <u>West Virginia</u>, 597 U.S. at 724, the Department of Education's plan to cancel $430 billion in student loans, which would have made a "staggering" economic impact, <u>Nebraska</u>, 600 U.S. at 502, and the Occupational Safety and Health Administration's COVID-19 vaccine mandate, which was deemed "a significant encroachment into the lives—and health—of a vast number of employees," <u>Nat'l Fed'n of Indep. Bus. v. Dep't of Labor</u>, 595 U.S. 109, 117 (2022). The court is also instructed to look for clear congressional authorization "[w]hen an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy" which "would bring about an enormous and transformative expansion in [the agency's] regulatory authority." <u>Util. Air. Reg. Grp. v. EPA</u>, 573 U.S. 302, 324 (2014).

Plaintiffs assert this case poses a major question "because it involves a matter of significant economic and political significance," pointing to the large impact of agriculture on the national and state economies. (DE 13 at 17). There is no doubt that agriculture is an economically and politically significant industry.[10] However, the court cannot conclude that a regulation raises a

---

[10] According to plaintiffs, "[a]griculture contributed roughly $1.53 trillion to the United States' gross domestic product in 2023," and "generat[ed] $111.1 billion in annual state gross product" in North Carolina. (Plfs' SMF ¶ 11).

major question simply because it relates to an important industry. Rather, it is "the history and breadth and economic and political significance of the action at issue" that requires application of the major questions doctrine. N.C. Coastal Fisheries, 76 F.4th at 296.

Here, the agency action in question, promulgation of the Final Rule, and in particular the challenged portions related to "Protections for Worker Voice and Empowerment," is not a sweeping overhaul of the entire agriculture industry. Instead, the Final Rule reforms a single government program through which some agricultural employers are permitted to employ some foreign workers on a temporary or seasonal basis. Although the parties agree the number of such workers is growing, (see Defs' Resp. Plfs' SMF (DE 37) ¶ 17), plaintiffs have not demonstrated it is large enough to require classifying this issue as a major question. Compare N.C. Coastal Fisheries, 76 F.4th at 299 ("Almost every commercial or recreational fishermen [sic] in America would be subject to the EPA's new regulatory control.") with Final Rule 89 Fed. Reg. 33995 n.79 ("In 2022, direct on-farm employment amounted to 2.6 million jobs," but in the same year Labor "certified H-2A temporary labor certifications for around 370,000 jobs.").

Plaintiffs' argument that a separate regulatory scheme exists to cover labor relations is similarly unpersuasive. In N.C. Coastal Fisheries, the Fourth Circuit held that the major questions doctrine applied to the issue of whether returning bycatch qualifies as a discharge of a pollutant under the Clean Water Act. 76 F.4th at 297. The court's primary reason was that a "distinct regulatory scheme . . . leaves regulating bycatch to the states and the National Marine Fisheries service—not the EPA." Id. However, it was also persuasive in that case that EPA itself did not claim its authority stretched so far. Id. at 299; see also Brown & Williamson, 529 U.S. at 157 (FDA's repeated denial of authority to regulate tobacco products "bolster[ed] the conclusion that

when Congress created a distinct regulatory scheme addressing the subject of tobacco and health, it understood that the FDA is without jurisdiction to regulate tobacco products.").

In contrast here, the "distinct regulatory scheme" plaintiffs present does not cover the relationship between agricultural workers and their employers. See 29 U.S.C. § 152(3) (NLRA's definition of "employee"). Because Congress explicitly excluded agricultural laborers from its definition of employees subject to regulation by the National Labor Relations Board (the "NLRB"), that agency's regulations do not and cannot govern the relationships at issue here: those between employers, foreign temporary agricultural workers, and workers in corresponding employment. Therefore, Labor's issuance of the Final Rule does not arrogate authority left by Congress to the NLRB.

Nor does Labor here purport to find new authority in an old statute. The agency has included anti-retaliation provisions in its regulations of the H-2A program since the enactment of the IRCA. See Labor Certification Process for the Temporary Employment of Aliens in Agriculture and Logging in the United States, 52 Fed. Reg. 20496, 20517 (June 1, 1987) (the "1987 Interim Final Rule") (H-2A employers may not retaliate against any individual for filing complaints, instituting proceedings, testifying in proceedings, consulting with a legal assistance program, or exercising rights or protections afforded under current 8 U.S.C. § 1188 and corresponding regulations). Although previous regulations did not regulate in the same precise manner, the Final Rule does not "bring about an enormous and transformative expansion" of Labor's authority. See Util. Air, 573 U.S. at 324.

In sum, the Final Rule does not raise a major question, and the court therefore conducts the standard analysis required by the APA. See N.C. Coastal Fisheries, 76 F.4th at 296; Baxter v. Becerra, no. 3:23-cv-92, 2024 WL 627262, at *12 (E.D. Va. Feb. 14, 2024) (concluding the major

question doctrine does not apply and "[t]hus, the [agency's] reading will be upheld so long as it merely comports with [the enabling statute's] plain text—no 'clear statement' is required").

The court in Int'l Fresh Produce applied the major questions doctrine without stating the basis for such application. See 758 F. Supp. 3d at 586 (quoting VanDerStok v. Garland, 86 F.4th 179 188 (5th Cir. 2023), rev'd on other grounds sub nom. Bondi v. VanDerStok, 145 S. Ct. 857 (2025)) ("Only where the statutory text shows that [the agency] has clear congressional authorization to enact a regulation can such a regulation withstand judicial scrutiny.")  Because this court determines the major questions doctrine does not apply, it departs from the reasoning set out in Int'l Fresh Produce.

      b.     Labor's Authority Under IRCA

"When reviewing a particular agency action challenged under § 706(2) of the APA, the court is first required to decide whether the agency acted within the scope of its authority." Kentuckians for Commonwealth, Inc. v. Rivenburgh, 317 F.3d 425, 439 (4th Cir. 2003).  Thus, the court here must determine the scope of Labor's authority to issue regulations concerning the H-2A visa program.  "The first step in this analysis is an examination of the statute providing authority for the agency to act.".  Id.

Although the Department of Homeland Security ("Homeland Security") is "charged with the administration and enforcement of . . . laws relating to the immigration and naturalization of aliens," 8 U.S.C. § 1103, Congress granted general authority regarding "admission to the United States of any alien as a nonimmigrant" to the Attorney General, 8 U.S.C. § 1184(a)(1); see also id. § 1103(g)(2) ("The Attorney General shall establish such regulations, . . . delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out this section.").  For certain acts, this authority must be exercised "after consultation with

19

appropriate agencies of the Government," and for the purposes of the H-2A visa program, "the term 'appropriate agencies of the government' means the Department of Labor." Id. § 1184(c)(1). Thus, Labor is required to participate in deciding whether to issue any H-2A visas.

Labor's involvement in the H-2A visa program is circumscribed by 8 U.S.C. § 1188, which sets out the standards by which the Secretary approves temporary labor certifications. Specifically and before the Attorney General issues an H-2A visa, the Secretary must certify that "(A) there are not sufficient workers who are able, willing, and qualified . . . to perform the labor or services" needed and "(B) the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed." Id. § 1188(a)(1). The Secretary must make this certification if

> the employer has complied with the criteria for certification (including criteria for the recruitment of eligible individuals as prescribed by the Secretary), and . . . the employer does not actually have, or has not been provided with referrals of, qualified eligible individuals who have indicated their availability to perform such labor or services on the terms and conditions of a job offer which meets the requirements of the Secretary.

Id. § 1188(c)(3)(A). This effectuates the

> Congressional policy that aliens not be admitted under this section unless there are not sufficient workers in the United States who are able, willing, and qualified to perform the labor or service needed and that the employment of the aliens in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed.

Id. § 1188(c)(3)(B)(iii).

In order to maintain their certifications, H-2A employers must "offer to provide benefits, wages and working conditions required pursuant to [§ 1188] and regulations." Id. § 1188(c)(3)(B)(i). Employers also "shall furnish housing in accordance with regulations" to all H-2A employees. Id. § 1188(c)(4).

"When the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." Loper Bright, 603 U.S. at 395. According to two courts in parallel cases, "the 'best reading' of [8 U.S.C.] § 1188, in its entirety, is that Congress granted [Labor] the authority to issue regulations to ensure that any certifications it issues for H-2A visas do not 'adversely affect' American agricultural workers." Kansas, 749 F. Supp. 3d at 1374; accord Barton, 757 F. Supp. 3d at 781; but see Int'l Fresh Produce, 758 F. Supp. 3d at 588 (concluding that the plain text of § 1188 "cannot be read as such a broad grant of authority as to allow [Labor] to effectively provide collective action rights to H-2A workers in the name of reducing the adverse effect of the H-2A program on domestic workers"). This court finds persuasive the determination in Kansas and Barton that Labor acted within its § 1188 authority in issuing the Final Rule, for the following reasons.

Congress "often enact[s]" statutes in which "the agency is authorized to exercise a degree of discretion." Loper Bright, 603 U.S. at 394. "[S]ome statutes expressly delegate to an agency the authority to give meaning to a particular statutory term." Id. "Others empower an agency to prescribe rules to fill up the details of a statutory scheme, or to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility." Id. at 395. Therefore, it is the job of the court to "ensur[e] the agency has engaged in reasoned decisionmaking within those boundaries." Id.

In AFL-CIO v. Dole, 923 F.2d 182 (D.C. Cir. 1991) (hereinafter, "Dole"), the United States Court of Appeals for the District of Columbia Circuit held that the IRCA represents a "broad congressional delegation" to Labor in which "Congress entrusted" the agency "to balance the competing goals of the statute—providing an adequate labor supply and protecting the jobs of

21

domestic workers." Id. at 187. Similarly, in Bayou Lawn & Landscape Servs. v. Sec'y of Labor, 713 F.3d 1080 (11th Cir. 2013) (hereinafter "Bayou Lawn"), the Eleventh Circuit held that 8 U.S.C. § 1101(a)(15)(H)(ii)(a), "which defines an agricultural worker, expressly grants [Labor] rulemaking authority over the agricultural worker H-2A program." Id. at 1084 (emphasis in original).[11]

Within 8 U.S.C. § 1188(c)(A), "Congress grants [Labor] the power to issue regulations to ensure that the certification requirements of § 1188(a)—specifically, the requirement that American agricultural workers not be adversely affected—are met before [Labor] issues . . . a certification." Kansas, 749 F. Supp. at 1370; see Overdevest Nurseries, L.P. v. Walsh, 2 F.4th 977, 980 (D.C. Cir. 2021) ("Congress directed the Secretary . . . to promulgate regulations that would set the parameters of the program, particularly for temporary workers coming to perform agricultural labor or services.").[12] Therefore, Labor acted here within its "broad congressional delegation," Dole, 923 F.2d at 187, and issued revisions in the Final Rule to

> help prevent exploitation and abuse of agricultural workers and ensure that unscrupulous employers do not financially gain from their violations or contribute to economic and workforce instability by circumventing the law, both of which would adversely affect the wages and working conditions of workers in the United States similarly employed, and undermine the Department's ability to determine whether there are, in fact, insufficient U.S. workers for proposed H–2A jobs.

89 Fed. Reg. 33900. That is, Labor determined that it could not prevent adverse effect on the wages and working conditions of domestic workers without the additional assurances required by the Final Rule. Accordingly, promulgation of the Final Rule fell within Labor's authority to "fill

---

[11] Notably, the courts in Dole and Bayou Lawn did not rely on Chevron deference in reaching these conclusions regarding Labor's authority under the IRCA.

[12] The court in Overdevest Nurseries subsequently applied Chevron deference to hold that Labor's definition of "corresponding employment" was reasonable. 2 F.4th at 984. However, that application does not affect the analysis herein.

22

up the details" of its statutory directive.  Loper Bright, 603 U.S. at 395.

The court recognizes that, in Int'l Fresh Produce, the district court distinguished Dole, 923 F.2d at 187, because "that case dealt with [Labor's] role in setting the adverse effect wage rate . . . as a means of ensuring domestic wages are not depressed."  758 F. Supp. 3d at 590.  It opined that such a role is "a much more limited exercise of authority than the grant of collective action rights at issue here."  Id.  This court again departs from the reasoning of Int'l Fresh Produce on this point. Setting an adverse effect wage rate mandates that H-2A workers and workers in corresponding employment are offered and paid a wage that Labor has determined will not cause adverse effect to U.S. workers similarly employed.  See Dole, 923 F.2d at 184.  Employers who choose to participate in the H-2A program must agree to abide by that requirement and include the appropriate wage in their job offers.  Id.  Similarly here, the challenged portions of the Final Rule set additional terms of employment which Labor has determined will prevent adverse effect to U.S. workers and which prospective H-2A employers must agree to include in their job offers.  89 Fed. Reg. 34062-63.  Therefore, recognizing its departure from the reasoning in Int'l Fresh Produce, the court concludes that the Final Rule falls within Labor's authority "to prescribe rules to fill up the details of [the] statutory scheme," and to "regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility."  Loper Bright, 603 U.S. at 395.

c.    Arbitrary and Capricious

An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43

23

(1983); accord Sierra Club v. W. Va. Dep't of Env't Prot., 64 F.4th 487, 501 (4th Cir. 2023).

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs., 463 U.S. at 43. However, the "court must ensure that the agency has examined the relevant data and articulated a satisfactory explanation for its action, and must not reduce itself to a 'rubber-stamp' of agency action." N.C. Wildlife Fed'n v. N.C. Dep't of Transp., 677 F.3d 596, 601 (4th Cir. 2012). Under this standard, the "reviewing court may look only to the agency's contemporaneous justifications for its actions." Appalachian Voices v. U.S. Dep't of Interior, 25 F.4th 259, 269 (4th Cir. 2022). Although the court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974), the court "may not supply a reasoned basis for the agency's action that the agency itself has not given." Motor Vehicle Mfrs., 463 U.S. at 43.

Here, before issuing the Final Rule, Labor

> determined through program experience, recent litigation, challenges in enforcement, comments on this rulemaking as well as on prior rulemakings, and reports from various stakeholders that it is necessary to adopt stronger protections for agricultural workers to better ensure that employers, agents, attorneys, and labor recruiters comply with the law, and to enhance program integrity by improving the Department's ability to monitor compliance and investigate and pursue remedies from program violators.

89 Fed. Reg. 33900. Labor intended the Final Rule's revisions "to strengthen the ability of workers to advocate on behalf of themselves and their coworkers regarding their required terms and conditions of employment, to better protect against adverse effect on similarly employed workers in the United States." Id. at 33901. Labor thus expressly relied on the factors which Congress intended it to consider, including whether the employment of an H-2A worker will "adversely

affect the wages and working conditions of workers in the United States similarly employed." <u>See</u> 8 U.S.C. 1188(a)(1)(B).

Labor found that H-2A visa workers represent a population especially vulnerable to exploitation because of "the temporary nature of the work, frequent geographic isolation of the workers, and dependency on a single employer." 89 Fed. Reg. 33987. In particular, due to "the barriers they face, H-2A workers are less able and less likely to advocate on behalf of themselves or their coworkers to seek compliance with the terms and conditions of employment set forth in [Labor's] regulations, employment below which will adversely affect workers in the United States." <u>Id.</u> Labor also found that retaliation against H-2A workers for asserting or advocating for their rights remains common even with the earlier anti-retaliation provisions. <u>Id.</u> at 33993. In some instances, Labor "debarred and assessed penalties against H-2A employers that instructed workers to lie about their pay to investigators and threatened to kill, harm, punish, fire, blacklist, or deport workers for talking to authorities." <u>Id.</u> at 33998. Based on this experience, Labor determined that the existing H-2A program regulations did not provide sufficient protections for H-2A workers to advocate for themselves regarding working conditions. <u>Id.</u> at 33987.

The agency further found that similarly employed domestic workers "may be less likely to face unique vulnerabilities and forms of retaliation experienced by H-2A workers." <u>Id.</u> at 33992. "[U]se of the H-2A program has grown dramatically over the past decade while overall agricultural employment in the United States has remained stable, meaning that fewer workers in the United States are employed as farmworkers." <u>Id.</u> at 33990. Thus, Labor determined that the "exploitation and abuse" of H-2A workers by "unscrupulous employers" risks "contribut[ing] to economic and workforce instability" and potentially worse conditions for workers in the United States as a result. <u>Id.</u> at 34405. Because Labor is required to certify that H-2A visas will not adversely affect workers

in the United States, see id. at 33993 (citing 8 U.S.C. § 1188(a)(1)), additional requirements were necessary in order to "place the H-2A workforce on more equal footing with similarly employed workers [in the United States] and thus reduce the potential for this workforce's vulnerability to undermine the advocacy efforts of similarly employed workers." Id. at 33991.

After "consider[ing] the burden imposed on employers for each proposal" in its Notice, Labor "determined that the provisions adopted in [the Final Rule] strike the necessary balance, such that the Department can satisfy its statutory mandate under 8 U.S.C. § 1188(a)(1) when granting a labor certification to a prospective H-2A employer." Id. at 33993. Thus, Labor "has examined the relevant data and articulated a satisfactory explanation for its action," satisfying the standard for judicial review. N.C. Wildlife Fed'n, 677 F.3d at 601.

Plaintiffs argue Labor failed to consider how the Final Rule would impact state laws with which it conflicts, particularly N.C. Gen. Stat. § 95-79(b). That statute sets out that

> Any provision that directly or indirectly conditions the purchase of agricultural products, the terms of an agreement for the purchase of agricultural products, or the terms of an agreement not to sue or settle litigation upon an agricultural producer's status as a union or nonunion employer or entry into or refusal to enter into an agreement with a labor union or labor organization is invalid and unenforceable as against public policy in restraint of trade or commerce in the State of North Carolina. Further, . . . an agreement requiring an agricultural producer to transfer funds to a labor union or labor organization for the purpose of paying an employee's membership fee or dues is invalid and unenforceable against public policy in restraint of trade or commerce in the State of North Carolina.

N.C.G.S. § 95-79(b).

Labor considered comments addressing § 95-79(b) and expressed its belief that the statute presents no "clear conflict" or "direct and significant obstacle to the operation of the H-2A program or the specific regulation in question." 89 Fed. Reg. 34008. The court agrees that there is no direct conflict between the Final Rule and § 95-79(b). The first sentence of the statute "prohibits parties from conditioning a settlement agreement on an agricultural producer's union affiliation," and the

26

second sentence "prohibits a formalized agreement, like a collective bargaining agreement, from mandating that an agricultural producer process dues checkoffs." Farm Labor Org. Comm. v. Stein, 56 F.4th 339, 347, 349 (4th Cir. 2022) (emphasis in original).

In contrast, the Final Rule does not require agricultural employers to enter any agreements with provisions or requirements forbidden by § 95-79(b). The Final Rule does not mandate that H-2A employers engage with labor unions or process dues checkoffs. Rather, under the Final Rule, an employer seeking to employ H-2A workers must agree not to retaliate against "any person engaged in agriculture . . . because such person . . . has engaged in activities related to self-organization, . . . has refused to engage in any or all of such activities[,] or has refused to attend" certain employer-sponsored meetings. 89 Fed. Reg. 34062-63; 20 C.F.R. § 655.135(h)(2). The employer also must allow workers to designate a representative to attend certain investigatory interviews, and permit workers' guests to access employer-furnished housing. 89 Fed. Reg. 34063; 20 C.F.R. § 655.135(m), (n). These requirements can be met without violating § 95-79(b).

In sum, Labor considered the necessary aspects of the issue and provided sufficient justification for its decision. See N.C. Wildlife Fed'n, 677 F.3d at 601. Thus, issuance of the Final Rule was not arbitrary or capricious.

### d. National Labor Relations Act

Plaintiffs argue the Final Rule conflicts with the NLRA by improperly providing agricultural workers with "NLRA-style rights." The court disagrees.

The policy behind the NLRA was

> to eliminate the causes of certain substantial obstructions to the free flow of commerce . . . by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose negotiating the terms and conditions of their employment.

29 U.S.C. § 151; see Metro. Life Ins. Co. v. Mass., 471 U.S. 724, 753 (1985) ("The NLRA is concerned primarily with establishing an equitable process for determining terms and conditions of employment, and not with particular substantive terms of the bargain that is struck when the parties are negotiating from relatively equal positions.").

In relevant part, the NLRA expressly provides "employees" with "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. The NLRA prohibits employers from discriminating against their employees "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). The NLRA also bars employers from discharging or otherwise discriminating against an employee because the employee files charges or gives testimony in a proceeding under the NLRA. 29 U.S.C. § 158(a)(4). The NLRA established the NLRB and provided it with enforcement authority to prevent unfair labor practices. 29 U.S.C. §§ 153, 156, 160.

Under the NLRA, it is "an unfair labor practice for an employer . . . to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). To "bargain collectively" is a term of art which includes "the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment," and "the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached." Id. § 158(d).

However, under the NLRA, "any individual employed as an agricultural laborer" is expressly excluded from the definition of "employee" and is therefore not entitled to the act's protections. 29 U.S.C. § 152(3); see also Holly Farms Corp. v. N.L.R.B., 48 F.3d 1360, 1370 (4th Cir. 1995) ("The protections of the Act extend only to statutory employees."). Thus, agricultural workers, including individuals hired through the H-2A visa program, are not "employees" with "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively[,] . . . [or] to engage in other concerted activities" under the NLRA. See 29 U.S.C. § 157.

The NLRA is applicable to all employers in the United States other than federal or state governments and persons subject to the Railway Labor Act. 29 U.S.C. § 152(2). In contrast, the Final Rule sets out requirements for participation in a voluntary program. See 89 Fed. Reg. 33994 ("employer participation in the H-2A program is voluntary"). Any employer who wishes to hire nonimmigrant workers to perform agricultural labor or services on a temporary or seasonal basis must agree to the conditions Labor has determined will prevent adverse effect on U.S. workers similarly employed. Id. On the other hand, if an employer does not wish to be bound by the requirements of the Final Rule, it may choose not to participate in the H-2A program. Id.

To the extent the Final Rule provides protections to agricultural workers, they are not coextensive with the rights expressly bestowed by the NLRA. H-2A workers and workers in corresponding employment are protected from employer retaliation for engaging in certain activities, but they are not guaranteed a positive right to engage in such activities. See 89 Fed. Reg. 34062; 20 C.F.R. § 655.135(h)(2). Thus, where such activities are forbidden by state law, the Final Rule gives no protection. "The [F]inal [R]ule does not require H-2A employers to recognize labor organizations or to engage in any collective bargaining activities . . . , nor does it create any independent rights or obligations for labor organizations." 89 Fed. Reg. 33901. Rather,

29

it prohibits "retaliation for self-advocacy and concerted activity." Id. at 34005. Thus, while an H-2A employer may not retaliate against employees for joining a labor union, the employer is under no obligation to acknowledge or engage with such a union.

The revisions to 20 C.F.R. § 655.135(h) are also significantly different from the right of employees under the NLRA "to bargain collectively through representatives of their own choosing," 29 U.S.C. § 157, and the corresponding classification as an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157." Id. § 158(a). The Final Rule does not classify any act as an unfair labor practice, does not restrict proactive interference, and does not require H-2A employers to bargain with anyone.

Plaintiffs argue the Final Rule conflicts with the NLRA because the requirement that H-2A employers allow agricultural employees to designate a representative to attend certain investigatory interviews "is almost a carbon copy" of the Court's interpretation of the NLRA in NLRB v. Weingarten, 420 U.S. 251, 260 (1975). However, Labor explained that it "adopt[ed] the 'investigatory interview' concept from the NLRA context to enhance workers' ability to engage in concerted activities for the purpose of mutual aid or protection, thus helping to avoid adverse effects on similarly employed workers in the United States." 89 Fed. Reg. 34012. Although Labor drew "on the Weingarten body of case law[, it] note[d] that the term must be interpreted consistently with the statutory purpose of the INA and the H-2A program." Id. at 34013. Thus, although the language of the Final Rule mirrors portions of the NLRA, Labor made clear that it did not intend the Final Rule to apply beyond its statutory mandate.

Without addressing the definition of "collective bargaining," the courts in Kansas and Barton determined the Final Rule conflicts with the NLRA by bestowing upon H-2A workers the right to collectively bargain. See Kansas, 749 F. Supp. 3d at 1376; Barton, 757 F. Supp. 3d at 786.

Specifically, the <u>Kansas</u> court determined that the Final Rule improperly affords H-2A workers "the right to collectively bargain" because "much of the Final Rule's language mirrors that of the NLRA." 749 F. Supp. 3d at 1376-77; <u>accord</u> <u>Barton</u>, 757 F. Supp. 3d at 786 ("The Final Rule not so sneakily creates substantive collective bargaining rights for H-2A agricultural workers.").[13] However, as stated above, to "collectively bargain" is a term of art defined in the NLRA as "the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith," and "the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached." 29 U.S.C. § 158(d). Because nothing in the Final Rule requires such "mutual obligation" or "negotiation," it does not convey a right to collectively bargain. The court therefore departs from the reasoning of the <u>Kansas</u> and <u>Barton</u> courts on the issue of NLRA conflict.

Plaintiffs here rely on <u>Alexander v. Sandoval</u>, 532 U.S. 275 (2001), for the proposition that Labor "may not create a right that Congress has not." <u>Id.</u> at 291. This reliance is misplaced. <u>Sandoval</u> resolved the question of "whether private individuals may sue to enforce disparate-impact regulations promulgated under Title VI of the Civil Rights Act of 1964," not "whether the [agency] regulation was authorized by [the statute]." <u>Id.</u> at 278, 279. Here, the court is tasked with determining whether Labor was authorized to promulgate the Final Rule, not whether a private individual may sue to enforce its terms. Therefore, any argument regarding whether Congress intended to create a private right of action has no bearing on this court's decision. Additionally, Labor expressly "decline[d] to . . . include a private right of action in [20 C.F.R. §

---

[13] The <u>Barton</u> court also determined that certain sections of the Final Rule are arbitrary and capricious and that the revisions to 20 C.F.R. § 655.135(n) constitute an unconstitutional taking. 757 F. Supp. 3d at 786-90. This court does not address these arguments because they were not put forward by the parties before it.

655.135(h)(1)(vii)] (or any of the provisions at § 655.135(h)), since it did not propose or seek comment on such a proposal." 89 Fed. Reg. 34001.

Furthermore, the Final Rule is not preempted by the NLRA. Although "the NLRA contains no statutory pre-emption provision, . . . [t]he [Supreme] Court has articulated two distinct NLRA pre-emption principles." Metro. Life Ins. Co., 471 U.S. at 748. These are: 1) preemption under San Diego Building Trades Council v. Garmon, 359 U.S. 236 (1959) (hereinafter "Garmon preemption"), and 2) preemption under Lodge 76, Int'l Ass'n of Machinists v. Wis. Emp. Rels. Comm'n, 427 U.S. 132 (1976) (hereinafter "Machinists preemption"). For the following reasons, neither of these principles preempts the Final Rule.

Under Garmon preemption, "States may not regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits." Wis. Dep't. of Indus., Labor & Human Relations v. Gould, 475 U.S. 282, 286 (1986). Such preemption does not apply when, as here, the workers at issue are wholly excluded from the protections of the NLRA. See, e.g., Willmar Poultry Co., Inc. v. Jones, 430 F. Supp. 573, 577 (D. Minn. 1977) ("regulation[] of labor relations activity including agricultural laborers is not preempted on the ground that such activity is either protected or prohibited by the NLRA because the NLRA's protections and prohibitions do not apply to agricultural laborers"). Therefore, the provisions of the Final Rule that apply to agricultural workers are not preempted by the NLRA under Garmon.

Under Machinists preemption, certain aspects of labor relations are beyond the regulatory power of both the states and the federal agencies because "Congress meant to leave some activities unregulated." 427 U.S. at 144. Specifically, regulation of labor relations is impermissible when it is of "an activity that Congress intended to be 'unrestricted by Any governmental power to regulate.' " Id. at 141 (quoting NLRB v. Ins. Agents' Int'l Union, 361 U.S. 477, 488–89 (1960))

(capitalization in original). "[A]ttempts to influence the substantive terms of collective-bargaining agreements are . . . inconsistent with the federal regulatory scheme," and are therefore preempted. Id. at 153.

Even the NLRB, the federal agency with authority to enforce the NLRA, cannot regulate in these areas. Id. at 149 ("Our decisions hold that Congress meant that these activities, whether of employer or employees, were not to be regulable by States any more than by the NLRB."). Thus, Machinists preemption principles apply to any "regulation, whether federal or State of the choice of economic weapons that may be used as part of collective bargaining." Id. at 153. The Court later described Machinists preemption as creating a "free zone from which all regulation, whether federal or State, is excluded" because "Congress intended to give parties to a collective-bargaining agreement the right to make use of 'economic weapons' not explicitly set forth in the Act, free of governmental interference." Golden State Transit Corp. v. Los Angeles, 493 U.S. 103, 111 (1989). "[T]he crucial inquiry regarding" Machinists preemption is "whether the exercise of plenary state authority . . . would frustrate effective implementation of the Act's processes." Machinists, 427 U.S. at 147-48.

Here, Machinists preemption does not apply to the Final Rule because Congress did not intend labor relations between agricultural workers and their employers to be "unrestricted by [a]ny governmental power to regulate." Machinists, 427 U.S. at 141. The Final Rule is not "inconsistent with the federal regulatory scheme" because it does not "attempt[] to influence the substantive terms of collective-bargaining agreements." Id. at 153; see Metro. Life Ins. Co., 471 U.S. at 755 (Because "minimum . . . labor standards affect union and nonunion employees equally, and neither encourage nor discourage the collective-bargaining processes that are the subject of the NLRA," such standards do not have "any but the most indirect effect on the right of self-

organization established in the Act."). Additionally, the exercise of state authority over agricultural labor relations does not "frustrate effective implementation of the [NLRA's] processes." Id. at 148. This is evidenced by the various state laws regulating agricultural labor relations cited by plaintiffs. See, e.g., Ariz. Rev. Stat. § 23-1381 to 1395; Cal. Lab. Code §§ 1140-1167; Kan. Stat. § 44-818 to 830; La. Stat. § 23:881 to 889; Mass. Gen. Laws ch. 150A, § 5A; Or. Rev. Stat. § 662.805 to 662.825; Wis. Stat. Ann. § 111.115(3); see also Chamber of Com. v. City of Seattle, 890 F.3d 769, 793 (9th Cir. 2018) (reasoning that "the fact that a group of workers," such as agricultural laborers, "is excluded from the definition of 'employee' in §152(3), without more, does not compel a finding of Machinists preemption").

In issuing the Final Rule, Labor did not establish collective bargaining rights for H-2A workers or "attempt[] to influence the substantive terms of collective-bargaining agreements," Machinists, 427 U.S. at 153. Rather, in order to fulfill its statutory mandate to protect the wages and conditions of U.S. agricultural workers, the agency added new "minimum labor standards" for employers choosing to participate in the H-2A program. Metro. Life Ins. Co., 471 U.S. at 755; see, e.g., 89 Fed. Reg. 34062 ("Assurance and obligations of H-2A employers"). Although the language Labor chose mirrors a portion of the NLRA, as described above, it by no means usurps the authority of the NLRB. Nor does the final rule prevent states from regulating collective bargaining or unions of agricultural workers. Therefore, the Final Rule does not conflict with the NLRA.

e. Severability

Where the court does not find the challenged portions of the Final Rule unlawful, the court does not reach plaintiffs' request to hold unlawful, vacate, enjoin, or set aside the entirety of the

Final Rule, nor defendants' alternative request to hold any particular portion of the final rule severable.

## CONCLUSION

Based on the foregoing, the court orders the following:

1)     Intervenor defendants' motion to intervene (DE 25) is GRANTED IN PART and DENIED IN PART as set forth herein. The clerk is DIRECTED to redesignate each intervenor defendant as an amicus on the face of the docket. In addition, intervenor defendants' proposed response in opposition (DE 33) is DEEMED an amicus brief in support of defendants;

2)     Plaintiffs' motion for summary judgment is DENIED;

3)     Defendants' motion for summary judgment is GRANTED;

4)     Defendants are entitled to judgment in their favor on all claims; and

5)     The clerk is DIRECTED to close this case.

SO ORDERED, this the 5th day of May, 2025.

_____
LOUISE W. FLANAGAN
United States District Judge